[Crim. No. 35. Fourth Appellate District.—January 16, 1931.]

THE PEOPLE, Respondent, v. JOE A. SMITH, Appellant.

Josiah Coombs for Appellant.

U. S. Webb, Attorney-General, and Lionel B. Browne, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant was charged with the violation of the Corporate Securities Act of the state of California in an information containing eleven counts, each count being similar in form to the first one, which reads as follows: "Joe A. Smith is accused by the District Attor-

ney of Riverside County and State of California, by this information of the crime of a felony, to-wit: violation of the Corporate Securities Act committed as follows: That said defendant on or about the 16th day of December, 1929, at the said County of Riverside, State of California, and before the filing of this information, did willfully and unlawfully sell to J. A. Toombs and Hazel Toombs for value, 1000 shares of stock in Angeles Mines Incorporated, a corporation, purporting to convey an interest in a business to be carried on for profit, to-wit: the business of mining, under the name and style of Angeles Mines Incorporated, without first obtaining a permit from the Corporation Commissioner of the State of California so to do.'' He was found guilty by a jury and from the judgment which followed he has taken this appeal.

It is earnestly urged that the case must be reversed because the appellant, as an individual, was selling stock personally owned by him, which he had acquired for value, and that he comes within the exception provided for in section 2 (c), paragraph 3 of this act, which exception reads as follows: '' (c) Except as hereinafter expressly provided, the provisions of this act shall not apply to the sale of any security in any of the following transactions: . . . 3. The sale in a *bona fide* way of any security by an owner who is not the issuer or an underwriter thereof, who sells the same for his own account; and not for the purpose of evading the provisions of this act.'' (Stats. 1929, p. 1254.) Appellant relies upon the case of *People* v. *Pace*, 73 Cal. App. 548 [238 Pac. 1089, 1094]. In that case the question was presented as to whether or not an individual who was a *bona fide* owner of securities might lawfully sell them in repeated and successive transactions of a like or similar character, without first securing a license or permit in accordance with the provisions of the Corporate Securities Act. It was there held that this act as it then stood, was unconstitutional, in so far as it attempted to prevent such a *bona fide* owner from selling securities individually owned by him in repeated and successive transactions of like or similar character. That case involved a question very different from the one now before us, it being there pointed out by the court that the defendant therein had informed the parties purchasing stock from him that the stock being sold them was not

treasury stock but was being transferred to them through some individual; that the corporation received no part of the money paid by the purchasers of the stock and all such money was retained by the defendant as his own funds; that no contention was made either at the trial or upon appeal that the defendant was not the *bona fide* owner of the stock sold; that no contention was made that the defendant either in acquiring the stock or selling the same was acting for the corporation; and further, that it was not even suggested that the defendant in acquiring and selling the stock was resorting to a subterfuge, in order to avoid the necessity of procuring a permit. In its opinion, the court said: "We would suggest that if the purpose of the section is to prevent fraudulent conduct in the sale of securities, it would not be a difficult matter to draft a provision of the law that would meet such a need." Subsequently, the Corporate Securities Act was amended and the portion providing an exception to the necessity of obtaining a permit, so far as here applicable, now reads as above set forth. It is appellant's contention that he comes within that exception; that the only question involved is as to whether he was the owner of the stock alleged to have been sold; that it affirmatively appears from the People's evidence that he was such owner, and the case should not have been allowed to go to the jury; and, further, that all evidence concerning the circumstances of each sale, and all evidence as to how he acquired the stock in question was inadmissible. On the other hand, it was and is the theory of the prosecution that it was proper to submit to the jury the questions as to whether the defendant was in fact the owner of the stock sold and was selling it in a *bona fide* way, whether he was selling the same for his own account and not for the benefit of the corporation, and also, whether he made the sale in the manner he did for the purpose of evading the provisions of this act.

The stock sold by appellant was certain stock in a corporation organized under the laws of the state of Nevada, under the name of "Angeles Mines, Incorporated". It is conceded that this corporation had never applied to the corporation commissioner of the state of California for a permit to sell securities, that the appellant had never applied for a broker's or agent's license or permit to sell securities,

and that no such permits had been issued. It is also conceded that the appellant sold shares of stock in this corporation to the several individuals, and in the amounts, as alleged in the various counts of the information. In connection with the incorporation of Angeles Mines, Incorporated, and how the stock in question came into the possession of appellant, the following facts appear: Articles of incorporation of the company named were filed in the office of the Secretary of State of the state of Nevada on June 6, 1929, naming as original subscribers and first directors, three persons, to wit: Frank S. Cliff with 300 shares, F. E. Meder with 100 shares and L. H. Peters with 100 shares. These articles were signed by these three persons and acknowledged on June 6, 1929. The minutes of the corporation show that the first meeting of incorporators was held on June 6, 1929, in Carson City, Nevada, the above-named three incorporators being present. It was reported that the articles of incorporation had been filed on that same day; the three persons above named were elected directors to hold office for the ensuing year, and a resolution was adopted authorizing the directors to issue the entire capital stock of the company ''for money, labor done, personal property, real estate or leases thereof, or any of such considerations, as they shall from time to time deem advisable''. Thereupon, the secretary presented transfers of subscription as follows: From Frank S. Cliff to Joe E. Smith, 300 shares; from F. E. Meder to Joe E. Smith, 100 shares, and from L. H. Peters to Joe E. Smith, 100 shares. A motion was passed approving these transfers, the written transfers being entered in the minutes. While there is an error as to the middle initial, appellant conceded in his testimony that these shares were on that date transferred to him. The next meeting shown by the record is the first meeting of directors, which was held in Carson City, Nevada, on June 13, 1929, pursuant to a written waiver of notice signed by Frank S. Cliff, F. E. Meder and L. H. Peters, although they had previously assigned to appellant all their stock in the corporation. The minutes of this meeting show that Cliff was elected president, Meder vice-president and Peters secretary and treasurer. Thereupon, the chairman read a letter from appellant offering to quitclaim to the corporation all his interest in certain mining claims in Los

Angeles County, California, described in the letter, in exchange for 350,000 shares of the common stock of the corporation, at the par value of $1 per share, the same to be issued to him or to his nominees; whereupon, at the same meeting, a resolution was adopted accepting this offer and directing the transfer of said 350,000 shares of stock to the appellant. Thereupon, these same three directors adopted a resolution accepting their own resignations as officers and directors of the corporation, to take effect at the close of the meeting. Thereupon, the appellant, his attorney, and another, were elected officers and directors of the corporation by the three retiring directors, the appellant being elected president, treasurer and director. The minutes of the same meeting, on June 13, 1929, in addition to the written resignation as officers and directors of the three original incorporators, also show that there was put in the signed but undated resignations of appellant's attorney and the other party, who on that day had been elected officers and directors with the appellant.

It thus appears that appellant owned all of the stock of the incorporators from and after June 6, 1929, that his proposition to exchange his mining claims for 350,000 shares of stock in the corporation was presented at the first meeting of the board of directors and accepted that same day by three directors who had a week before assigned all of their interest in the corporation to the appellant, and who at the same meeting at which they accepted this proposition, accepted their own resignations as officers and directors of the corporation and elected appellant, his attorney and another, as such officers and directors; and that all of these new officers and directors, with the exception of the appellant, at the same time handed in their undated resignations as such officers and directors. Thereafter, as shown by the minutes, these three new directors continued to hold meetings, presided over by the appellant as president, all subsequent meetings being held in Los Angeles, California. At the first meeting, on July 1, 1929, one Harcourt was employed as superintendent of construction on the company's mining properties. The appellant, as president of the corporation, was authorized to borrow the sum of $5,000, or any portion thereof, from any bank or individual. At a meeting of the board of directors on August 18, 1929, a report was

submitted by appellant, as president, showing the progress of development work at the mine and showing that four additional men had been employed. At a meeting on September 2, 1929, although no borrowing of money or other financing was reported by the president, he reported it was necessary to install a water system and was authorized to proceed therewith. At a meeting on September 16, 1929, the president reported that the water system had been installed, and that the corporation had incurred a monthly rental of $50 for water. At a meeting of the board of directors held on October 14, 1929, the by-laws were so amended as to permit the annual meetings of the stockholders to be held in Los Angeles. At a meeting held on January 16, 1930, the president was authorized to borrow $25,000, or any portion thereof, from any bank or individual.

It further appears that the defendant acquired the mining claims which he exchanged for the 350,000 shares in this corporation partly from one Harcourt and partly from two persons acting as trustees for one Carpenter. Harcourt testified that he owned five of these claims, upon which he had spent about $3,700 in development work, and that he thought they were worth about $50,000; that he quitclaimed these to the appellant on February 1, 1929, receiving 75,000 shares of stock in Angeles Mines, Incorporated, in payment therefor, but that this stock was not delivered to him until some time in July, 1929; that at the time he delivered the quitclaim deed to appellant, it was agreed between them that he was to get 75,000 shares of stock for his property, but at that time no corporation had been formed. He further testified that between May and September, 1929, appellant furnished to him various supplies for the purpose of developing the mine, including the paying of labor bills amounting to $1700. The appellant himself testified that while he bought the claims from Harcourt on February 1, 1929, and subsequently gave him 75,000 shares of stock in the corporation for the property, no agreement to do this was made before June, 1929, and that when Harcourt deeded the property to him it was agreed that Harcourt should have some interest but the amount thereof was not stipulated. He further testified that he bought the Carpenter claims for 25,000 shares of stock in the corporation, paying the same after the company was incorporated, but that when he

bought the same on February 2, 1929, there was no price agreed upon between them, but that "they were trusting to my integrity to deal fairly and rightly with them". He further testified that his proposition to exchange the mining property for 350,000 shares of stock in the·corporation was made to the corporation on the same day it was accepted; that the total issue of stock in the corporation was 350,000 shares, 250,000 of which were issued to him, 70,000 to Harcourt and 30,000 to Carpenter; that at the time of the trial he still owned 200,000 shares; that he had never met the three directors of the corporation at the time they elected him president on June 13, 1929, and transferred 350,000 shares of stock to him; that he first heard of the corporation on the day it was organized, and that he heard of it through his attorney; that the stock certificates had not been printed on June 13, 1929; and that he put in some improvements on the mining properties after he became president of the corporation but could not say how much he had expended in this, nor could he approximate it. He further testified that the original shares in the company were . transferred to him on June 6, 1929, as a part of the consideration for the proposition which he first made to the company on June 13, 1929, a week after the stock was transferred.

In reference to how the sales were made, the evidence shows that the appellant was a preacher; that he had formerly preached at the Four Square Church in Riverside, and most, if not all, of these sales were made to parties who attended this church. J. A. Toombs testified that he was a member of this church; that he became acquainted with appellant through the purchase of a Bible from him; that between the first and sixteenth days of December, 1929, appellant called at his home and told the witness and his wife that he had a project he was putting over; that he was selling stock in a mining company and he showed samples of gold and silver ore; that he told of a man named Carpenter, stating that Carpenter had been converted under his ministry and healed at one of his meetings; that he had investigated a mine belonging to Carpenter and decided it was a project fit "to put over to carry on the work of the Gospel"; that the project would pay dividends at the rate of twenty per cent a month, and that ten per cent of the net

earnings of the mines were to be set aside for the work of the Gospel, to be divided among the churches in different districts in proportion to the amount of money invested in each district; that appellant stated he was selling stock in the Angeles Mines, Incorporated, but said nothing about it being his own stock; that witness invested over $1,000 and had received nothing back; and that appellant promised the witness remuneration for any help he would give him in selling stock to others, saying that the state allowed him to give him ten per cent of any amount that the other party might invest. Appellant stated that he was representing the corporation of which he was president and was trying to raise some money to put the mine over; and that he needed the money to pay for some cyanide. Mrs. Hazel Toombs corroborated her husband's testimony and added that the appellant had stated that Carpenter wanted to give appellant a mine to help in the Lord's work and that "he just gave him this mine", and further, that appellant stated he "wanted to sell the stock and put over the mine and get this money, to go ahead and develop this mine". W. A. Hart, who also bought a thousand shares of this stock, testified that appellant told him "he wanted to raise money to develop that mine, and that is what the money—what stock he sold, that is what the money would be used for, for developing this mine, and he also said ten per cent of the net income after it was in operation, would go for Mission purposes, and also pay—commence paying the first of March, twenty per cent of what I might invest. In five months I would have my investment all paid back"; that appellant represented he was selling the stock "of the corporation"; that when he purchased this stock appellant took a blank certificate out of his brief case and filled in his own name, Joe A. Smith as the owner, and 1,000 shares on the face of the certificate, and then turned it over and filled in the other side; that appellant told him that the state authorities at Sacramento would not grant him a permit to sell stock with a clause in it giving ten per cent of the profits to missions, and that this was the reason the company was incorporated in Nevada; that he also told him he carried the blank certificates around with him in order to expedite matters, and all the purchaser would have to do was to send the stock in to Los Angeles and have it transferred; that he

further stated that the stock belonged to the Angeles Mines, Incorporated, and that every dollar which the witness paid for the stock would be used in the development of this mine. Mrs. Milholland testified that she purchased some of the stock; that appellant introduced himself as a representative and president of the Angeles Mines, Incorporated; stated that the purpose of the organization was chiefly religious, and secondly, financial, for the benefit of the investor; and that the money she paid was to be used in the development of the mine. Mrs. Glick testified that appellant told her he was representing the corporation and that this was not his own stock. The appellant admitted having sold the stock as alleged in the information, but testified that the stock was issued to him in exchange for mining properties, and that he later sold the stock as his individual property.

Most of the contentions of appellant may be treated under the one head, that the evidence does not support the verdict. Appellant not only contends that it was necessary for the prosecution to show that he was not the owner of the stock he sold, but takes the further position that his ownership is conclusively shown by the certificates bearing his name upon their face, and by his testimony that he paid something of value for them, and therefore, that all other evidence as to such ownership or as to his methods in the sale of the stock, was inadmissible. He disposes of the question of fraud with the ingenious argument that one witness, a former owner of the mine, stated that it was worth $75,000 and that he had put $3,700 into its development, and since this conclusively shows that appellant had paid value for the 350,000 shares of stock, there was no fraud. Even if the mine was worth $75,000, appellant paid nothing until after the corporation was formed and then turned over 100,000 of the shares to the original owners of the land and kept 250,000 shares, although he had put nothing in. He himself testified that he paid nothing when he took the deed to the mining claims, and that there was no agreement as to what he was to pay until after the corporation was organized. Harcourt, from whom the claims on which the mine was situated were purchased, testified that when he gave the deed to appellant, on February 1, it was agreed he was to get $75,000 in stock but that no corporation was yet formed. Appellant not only represented to the various pur-

chasers that he was selling stock for the company in order to get money with which to develop the mine, but the record shows that he actually put some money into such development work. While his counsel argues that it was legitimate for him to loan his own money to the corporation, we find no evidence in the record that he ever made any such loan.

Appellant argues that the words "*bona fide*" in the section of the California Securities Act we have been considering do not refer to the manner of sale but has to do only with the question of the genuineness of the ownership of the stock, and the genuineness of the incorporation of the company in another state for a legal purpose. We think these words also have reference to the manner of sale, but even if appellant is correct in his contentions, the evidence as to the method of sale and circumstances surrounding the organization of the company, and the acquiring of the stock by the appellant, the admission of which is attacked, was admissible for the purpose of showing whether the appellant was, in fact, the owner of the stock; whether, in fact, he was acting for himself or acting for the corporation; and whether his method of procedure was for the purpose of evading the provisions of the act in question. ■ The jury was not compelled to believe his statement that he was the owner of the stock, but was entitled to consider the surrounding circumstances in determining whether he was in fact the owner, whether he was acting for himself or for the corporation, and whether the sales were made in a *bona fide* way or for the purpose of evading the act.

■ The evidence shows that at the organization meeting of the corporation all of the stock in the company was transferred to appellant and that no one else owned any of the stock until he caused certain shares to be transferred to others in payment for the mining claims involved. At the time his proposition to exchange the mining claims for all of the stock of the corporation was acted upon, he owned all of the stock in the corporation and through dummy directors was dealing with himself. Whether or not he was the owner of the 350,000 shares of stock, he was, in fact, the issuer thereof. The evidence is sufficient to show that the sales of stock described in the information were not sales of securities by an owner who was not the issuer thereof; that such sales were not made in a *bona fide* manner by

an owner for his own account alone; and that such sales were not entirely for his own account but in part for the account of the corporation, and made with the purpose of securing funds to sufficiently develop the property which had been transferred to the corporation to make such a showing as would enable the appellant to make further sales for his own profit. We think the evidence is sufficient to show that the entire proceeding was carried out by the appellant for the purpose of evading the provisions of the Corporate Securities Act. If the circumstances disclosed by this record do not show a deliberate intention to evade this act, it would be difficult to imagine a set of circumstances that would show such an intention. In our opinion, the evidence is entirely sufficient to support the verdict.

Appellant complains of the giving and refusal of certain instructions, but except in one instance where the matter complained of was fully covered by another instruction, the views we have herein expressed dispose of these objections. After carefully examining the instructions, we find no error therein.

Appellant advances the proposition that under the authority of *People* v. *Pace, supra,* the portion of the act here under consideration, is unconstitutional. The matter is not otherwise argued, and the authority is so clearly not in point that we do not feel called upon to go into the question at any length. In our opinion, the point is without merit.

The judgment is affirmed.

Marks, J., and Warmer, J., *pro tem.,* concurred.