[Crim. No. 237.   Fourth Appellate District.—May 13, 1933.]

THE PEOPLE, Respondent, v. S. A. RATLIFF, Appellant.

Joe C. Burke, Charles B. DeLong, Mark L. Herron and Russell Graham for Appellant.

U. S. Webb, Attorney-General, and Warner I. Praul, Deputy Attorney-General, for Respondent.

CAMPBELL, J., *pro tem.*—The appellant S. A. Ratliff was charged in an amended indictment returned by the grand jury of San Diego County with the crime of violation of the Corporate Securities Act of the state of California and was convicted of the charge contained in count II of the indictment, which is as follows:

"2. The said S. A. Ratliff and W. B. Bird, on or about the 2nd day of April, 1929, in the County of San Diego, State of California, and before the finding of this indictment, did wilfully, unlawfully, knowingly and feloniously and for the purpose and with the intent then and there to evade the provisions of the Corporate Securities Act and the laws of the State of California, did then and there engage in the business of selling, offering for sale, negotiating for the sale of and dealing in the shares of the capital stock of the Pacific Copper Company, a foreign corporation, and as agents and brokers for and on behalf of said corporation, did then and there sell, offer for sale, authorize, direct and aid in the sale of, and cause and assist in causing to be sold to one Mrs. Lulu S. Edis, certain securities, to wit: ten thousand shares of the capital stock of the said corporation, whereas in fact no permit had then and there or theretofore been issued to or obtained by or on behalf of said corporation, from the State of California or the Department of Corporations of said State of California, authorizing the sale of shares of the capital stock of said corporation, or its securities in said State of California, which the said defendants and each of them then and there well knew. . . . "

This is an appeal from the judgment of conviction and from the order denying appellant's motion for a new trial. It appears from the evidence that during the early part of the year 1926, one Jarmouth entered into negotiations with appellant for the purpose of procuring the aid of the latter in raising funds to develop mining property belonging to the Tecopa Mines Company. The negotiations resulted in an understanding to the effect that appellant would receive a block of stock to sell in order to put the mine on production. When sufficient stock had been sold for that purpose

appellant was to receive additional stock so as to make his interest in the company at all times equal to that of Jarmouth. Altogether appellant came into possession of approximately 350,000 shares of the company's stock. Shortly after these negotiations another corporation was formed in the state of Nevada, known as the Pacific Lead Silver Mines Company, for the purpose of acquiring the assets of Tecopa Mines Company. On July 7, 1927, a contract was entered into between Jarmouth and appellant which recited in substance that the old company was being dissolved and stock of the new company issued to stockholders of the former company on a *pro rata* basis; that of the new stock there was issued to Jarmouth 1,039,653 shares and to appellant 1,008,500 shares, and that the latter was disposing of some of these shares, a portion of the proceeds from which was being applied to the development of the company's property. In January, 1929, appellant informed Fred F. Stevens, one of the witnesses, that he proposed to organize a company to be known as Pacific Copper Company, for the purpose of getting Pacific Lead Silver Mines Company stock away from people who were not entitled to hold it.

A certified copy of the articles of incorporation of Pacific Copper Company was introduced in evidence. The list of names of the first board of directors of the corporation did not contain the name of appellant. There is no testimony or other evidence tending to show that appellant was ever an officer or director of the Pacific Copper Company.

In the month of December, 1928, appellant had told the witness Keller that he had just returned from inspecting a mining property at Lordsburg, New Mexico, known as the Bonney mine; that it would be to the best interests "of the enterprise in all of its phases" to acquire this mine, and with that plan he had decided "to incorporate a new company to succeed the Pacific Lead Silver Mines Company to a degree". Appellant also said that he had contracted to buy the mine for a price in the neighborhood of $300,000. The new corporation was to have the same number of shares as the old company except that the par value would be one dollar instead of twenty-five cents. The shareholders in the old company, who had acquired their stock through appellant, would receive an even exchange of shares, but those who had not obtained their stock through him would be left

out of the new organization and thereby prevented from depressing the price in the outside market. The shares acquired in exchange were to go into the new company. Appellant also proposed to create a pool so that he would have absolute control of the market when the shares of the new company were listed on the stock exchange. The reasons for incorporating in Nevada are best shown by the following testimony of the witness Keller:

"Q. Did he discuss with you why he was incorporating this company in Nevada? A. Yes. Q. What did he say in that respect? . . . A. By incorporating in the state of Nevada we would be able to make the exchange of shares in the manner which he had described without interference of any kind, without being compelled to recognize these recalcitrant elements among the Tecopa shareholders and that he likewise would be placed in the same legal position with reference to the sale of shares in the Pacific Copper Company that he had been in during the time when shares were being sold by us in the Pacific Lead Silver Mine Company, and that— Q. What condition was that? A. The condition referred to was the sale of shares as his personally owned stock in the Pacific Lead Silver Mines Company and he would be placed in the same position excepting that he would be improved in this, that the Pacific Copper Company would own the property in Arizona, known as the Selman Mine and would own a property in New Mexico known as the Bonney Mine and it would not own any property itself in California, but through the ownership of shares in the Pacific Lead Silver Mines Company which it would acquire under a plan of exchange which he had proposed, which he intended to propose."

Subsequent to this conversation the Pacific Copper Company was organized under the laws of the state of Nevada, in the month of December, 1928.

Evidence was introduced to the effect that appellant made a written offer to the board of directors of Pacific Copper Company, at Las Vegas, Nevada, dated January 8, 1929, to sell to the Pacific Copper Company a certain option agreement dated December 5, 1928, by and between Bonney Mining Company, a corporation, and S. A. Ratliff, which option agreement conveyed to appellant an option to purchase what was generally known as the Bonney mine in

the state of New Mexico, for the sum of $300,000, to be paid in installments therein set forth. The written offer included, in addition to the option agreement, all of the mining machinery, tools and equipment located on the mining property and used in connection therewith, all of which was, by the written offer, proposed to be transferred to the Pacific Copper Company in exchange for 2,999,500 shares of the unissued capital stock of Pacific Copper Company, which offer was accepted and said number of shares of stock issued to appellant.

Appellant then organized a sales force in the state of California and began the exchange of shares in the Pacific Copper Company for shares of Pacific Lead Silver Mines Company; also the sale of shares in the former company for the purpose of financing its operations. On May 29, 1929, appellant wrote to the board of directors of Pacific Copper Company and stated in effect that 1,886,159 shares of Pacific Lead Silver Mines Company stock had been delivered to him by the owners; that of said shares 1,508,769 had been exchanged for a like number of shares of Pacific Copper Company; that of the remainder, 303,140 shares were held in escrow with the Pacific National Bank of Los Angeles pursuant to certain pool agreements and 75,250 shares were in process of exchange. A certificate for 1,508,769 shares of lead stock was tendered to the corporation. Appellant also advised that there were 3,000,000 shares of lead stock issued and outstanding, and that the 1,508,769 shares delivered to the new company represented a majority of the 3,000,000 shares. It is to be noted also that during this time both appellant and Pacific Copper Company occupied an office at 705 Foreman Building, Los Angeles, California.

Again on May 29, 1929, appellant wrote a letter to the board of directors of the Pacific Copper Company at 705 Foreman Building, Los Angeles, in which it was stated by appellant that he had, on and after July 1, 1928, agreed with stockholders of the lead company to sell certain of its shares of stock and donate from the proceeds approximately $250,000 to the company for the purpose of providing it with working capital. Subsequent to the execution of such agreement, additional agreements were entered into pro-

viding that said sum, in cash or its equivalent, should be donated to Pacific Copper Company in lieu of Pacific Lead Silver Mines Company. The letter further stated that between July 1, 1928, and May 29, 1929, he had advanced to Pacific Copper Company from the proceeds of stock sales the total sum of $160,480.28, in connection with the operations of the Bonney mine at Lordsburg, New Mexico, and the Selman mine at Superior, Arizona, and in connection with the Tecopa mine of the Pacific Lead Silver Mines Company; that appellant was handling in connection therewith twenty-three promissory notes "properly transferred to Pacific Copper Company", in the aggregate amount of $83,620, together with appellant's personal check for $5,899.72. In the aggregate these items amounted to $250,000.

At a meeting of the board of directors of the Pacific Copper Company held on May 31, 1929, 169,000 shares of stock of the company were issued to appellant in consideration for services rendered by him to and including the thirty-first day of May, 1929, in superintendence and operation of the properties owned by the company, and large sums of money advanced on behalf of the corporation, and other efforts in its behalf enumerated as follows: Advertising, traveling expenses, telephone and telegraph, maintenance of office, legal expenses, acquiring and advancement of funds necessary for the proper operation of the properties of the corporation, pending the completion of its financing.

The evidence further shows that appellant maintained an office in the city of Los Angeles and employed salesmen to sell the stock so issued to him; that in said office he employed a stenographer and bookkeeper and the books of Pacific Copper Company were kept in the same office by one Fred F. Stevens. It appears therefrom that the appellant superintended and controlled the operation of the company, paid the bills of the company and also paid the salaries of the employees of the Pacific Copper Company. The evidence shows clearly that a number of salesmen were employed and retained by appellant for the purpose of selling this stock. It also shows that some of the money so derived from the sale of the stock ostensibly issued to appellant

was used for operating the company. Stockholders' meetings were held on various occasions and those present were urged by appellant to buy more stock in order to provide funds for further development of the company's properties. Literature and bulletins describing the company's property and the desirability of becoming an investor were prepared and distributed under the supervision and direction of appellant.

Appellant concedes that on or about April 2, 1929, in the county of San Diego, W. B. Bird, a salesman employed by appellant, sold 10,000 shares of the stock of the Pacific Copper Company to Mrs. Lulu S. Edis. Appellant also concedes that pursuant to such employment as salesman by appellant one K. R. Pitcher sold to the said Lulu S. Edis on June 12, 1929, 15,000 shares of stock of said Pacific Copper Company. He concedes that during the months of April and June, 1929, salesmen in the employ of appellant sold a large number of shares of stock to various individuals residing in San Diego.

The testimony further shows that appellant attended many of the meetings of the board of directors of the Pacific Copper Company and that at many of the meetings matters affecting the corporation were discussed with appellant by the board of directors. The evidence shows that before the witness Fred M. Stevens became the secretary, treasurer and a director of Pacific Copper Company, he discussed with appellant the matter of accepting a position as such officer and director. The testimony shows that before Frank L. Purinton became president of Pacific Copper Company he was requested to do so by appellant. The testimony further shows that in the month of December, 1928, appellant gave the sum of $18,643.76 to the Pacific Copper Company, which sum included the $10,000 initial payment upon the Bonney mine; that in January, 1929, he gave the company the sum of $20,009.21, and in February, 1929, he gave said company the sum of $19,407.22. The testimony further shows that from July 1, 1928, to January 30, 1929, appellant advanced to the Selman mine $50,471.29, which mine was, on May 8, 1929, sold to Pacific Copper Company by appellant for the sum of $100; that appellant advanced to Pacific Copper Company in the month of August, 1929, the sum of $15,500 and in the month of September, 1929, $10,800.

The foregoing statement shows, in substance, the facts of the case as they are gleaned from the transcript of the testimony.

The points urged by appellant for reversal are: (1) that the court erred in overruling appellant's demurrer to count II of the indictment; (2) that the evidence is insufficient to support the verdict of guilty as to count II of the indictment; (3) that the court erred in admitting evidence over the objection of appellant; (4) that the court misdirected the jury in matters of law; and (5) that the court erred in refusing to clarify its instructions to the jury.

Appellant was tried on the original amended indictment containing two counts. The jury found him not guilty on the first count and convicted him on the second count. Appellant now complains that the second count did not state facts sufficient to constitute a public offense.

While the indictment in question is not as skillfully drawn as it might have been, still we think it conforms to sections 950, 951 and 952 of the Penal Code. Appellant is informed by the said indictment in ordinary concise language of the acts constituting the offense. The gist of the offense, as charged in the indictment, is that appellant sold, assisted, authorized, directed, and aided in the sale of stock for and on behalf of the corporation, which had no permit from the commissioner of corporations authorizing such sales.

Throughout the case the prosecution maintained the theory that the corporation was directly engaged in the sale of its stock in this state through the agency and instrumentality of appellant and that the issuance of the stock to appellant in the first instance was a subterfuge designed to make it appear that the stock was personally owned by appellant and, therefore subject to sale by him without regulation or supervision of the commissioner of corporations.

Section 3 of the Corporate Securities Act (Deering's Gen. Laws, 1931, Act 3814) provides that "No company shall sell any security, . . . or offer for sale, negotiate for the sale of or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do."

Section 18 of the act provides that "Every officer, agent or employee of any company, and every other person, who

knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this act, or of the Constitution of this state, . . . is guilty of a public offense. . . . "

We are of the opinion that count II of the indictment contains all the elements necessary to state a public offense. It was not necessary to allege in the indictment that the shares were not the property of appellant and were securities of the corporation's own issue (*People* v. *Main*, 75 Cal. App. 471 [242 Pac. 1078]).

Appellant next contends that the evidence is insufficient to show whether or not appellant was the owner of the shares sold to Mrs. Edis and whether the sale to her was for appellant's own account.

The evidence heretofore quoted satisfies us that the entire transaction was but a scheme of appellant to evade the Corporate Securities Act, and that the transfer of the stock to appellant by the company was simply a subterfuge. The evidence shows that appellant formulated a scheme of having shares issued in his name in order to sell them under the guise of personally owned stock for the purpose of financing the corporation without obtaining a permit from the commissioner of corporations of the state of California. The entire scheme is merely a sham to give the color of validity to a transaction otherwise unlawful, and allow an unscrupulous promoter to prey upon the unsuspecting public.

The evidence taken as a whole is not conflicting and the jury properly drew the inferences of guilt therefrom. . (*People* v. *Smith*, 111 Cal. App. 177 [295 Pac. 105]; *People* v. *Eiseman*, 78 Cal. App. 223 [248 Pac. 716]; *People* v. *McCalla*, 63 Cal. App. 783 [220 Pac. 436].)

Appellant contends that the court erred in receiving in evidence a copy of the articles of incorporation of Pacific Copper Company as certified to by the Secretary of State of Nevada, without a further certificate as contemplated in section 1918 of the Code of Civil Procedure. Sections 370a and 372 of the Civil Code answer this contention:

"370a. Proof of existence of foreign corporations. In any action or proceeding, civil or criminal, in any court of this state, a copy of the articles or certificate of incorporation of a foreign corporation duly certified by the secretary of state or other proper official of the state under the laws of which such corporation purports to be incorporated shall be *prima facie* evidence of the incorporation, existence and powers of such corporation, but such presumption may be rebutted by a statement under oath by such secretary of state or other official, or otherwise by competent evidence.

"A certified copy of the articles or certificate of incorporation of a foreign corporation issued by the secretary of state or other officer of this or any. other state in whose office the incorporation papers are filed as required by law shall be admitted in evidence by all courts and shall be *prima facie* evidence of the corporate existence and capacity of the corporation."

"372. Judicial notice of foreign law. In any action or proceeding, the court shall take judicial notice without proof in court of the constitution and statutes applying to foreign corporations, and any interpretation thereof, the seals of state and state officials and notaries public, and of the official acts affecting corporations of the legislative, executive and judicial departments of the state, territory or country under the laws of which said corporation purports to be incorporated."

It follows that the ruling of the court in admitting the document was not error.

■ The court admitted in evidence, over the objection of appellant, portions of the minutes of Pacific Copper Company, which contained recitals of what took place at the meeting of the board of directors, and particularly as to what appellant is alleged to have done and said at such meetings.

By section 371 of the Civil Code the regular meetings or a copy of the by-laws or of the minutes thereof are made *prima facie* evidence of the facts or actions stated therein.

■ Appellant contends that the court misdirected the jury in matters of law, and complains that the court instructed the jury that Pacific Copper Company was a corporation. The trial court's instructions, taken in their

entirety, make it clear that it was for the jury to determine whether Pacific Copper Company was a corporation. For example, we quote the following: "Again, if the Pacific Copper Company was a corporation," etc.

Appellant also complains of other instructions, but there is no merit to his contentions. We have read the instructions given by the court and find no inconsistencies or contradictions in them and they fairly state the law applicable to this case. The trial court refused to give instructions requested by appellant on the subject of sales and the passing of title to personal property, and this refusal is assigned as error. This requested instruction could not have added anything the jury should have known. The subject had already been covered. This likewise applies to instructions requested by appellant when the jury returned from its deliberations. The instructions given were framed in good English, and in view of that fact, it cannot be presumed that they were misunderstood.

The judgment and order appealed from are affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 12, 1933.