[Crim. No. 2200. First Dist., Div. One. Nov. 13, 1941.]

THE PEOPLE, Respondent, v. GEORGE O. ALLEN, Appellant.

F. H. Bowers for Appellant.

Earl Warren, Attorney General, David K. Lener, Deputy Attorney General, Ralph Hoyt, District Attorney, and George C. Perkins and Arthur K. Skerry, Deputies District Attorney, for Respondent.

PETERS, P. J.—On November 28, 1940, appellant was charged by information with four felonies—two counts of grand theft and two counts of violating the Corporate Securities Act. In the two grand theft counts it was charged that in June of 1937, on two separate dates, appellant unlawfully secured from one Eva C. Metz deeds to two parcels of

real property located in Oakland, each parcel being of the approximate value of $2,500. In the two corporate security act counts it was charged that on separate dates in June of 1937 appellant sold to Eva C. Metz, without first securing a permit from the state corporation department, two certificates for 5,000 shares each of the capital stock of the Castle Rock Gold Mining Company, an Arizona corporation, which shares constituted securities of appellant's own issue. In addition to alleging that each of the offenses was committed in Alameda County, each count charged that appellant "fled from the State of California to the State of Pennsylvania and was absent from and outside the boundaries and jurisdiction of the State of California continuously from the 1st day of June, 1938, to the 4th day of August, 1939." The jury found appellant guilty on each count. From the judgments of conviction, and from the court's orders denying his motions in arrest of judgment and for a new trial, appellant prosecutes this appeal.

 Appellant first challenges the sufficiency of the evidence to sustain his conviction on each count. A reading of the record demonstrates that this contention is without merit. The evidence produced by the prosecution shows that appellant, by false and fraudulent representations, induced Eva C. Metz to transfer to him two pieces of real property in return for stock of the Arizona corporation, and that, under the circumstances, the sale of that stock in California without a permit violated the provisions of the Corporate Securities Act.

The record shows the following: Andrew Moutier and his wife Iva owned a number of mining claims in Arizona totaling about 180 acres. These claims had been formerly owned by an Arizona corporation in which the Moutiers were interested. That corporation had expended about $75,000 in an unsuccessful attempt to develop the property. This corporation constructed some six hundred feet of tunnel, one hundred feet of shaft, purchased some machinery and removed some ore. No ore, however, had gone to the smelter. In 1911 the corporation had been dissolved and the mine abandoned. In 1920 the Moutiers purchased the claims at a tax sale. The claims lay dormant after 1911. In May of 1936 the Moutiers entered into a written agreement with appellant and his associate Dibert. By the terms of this agreement the

Moutiers transferred the claims to Allen and Dibert with the understanding that these two men, at their own cost and expense, would organize the Castle Rock Gold Mining Company of Arizona, and would transfer the claims to that corporation. It was agreed that Moutier was to be president of the corporation, and that he and his wife were to receive 125,000 shares of stock for their claims, 25,000 shares of which they agreed to sell to Allen and Dibert at twenty-five cents a share, or to permit Allen and Dibert to sell such shares for them at twenty-five cents a share. The written agreement did not specify the total number of shares to be issued, but Moutier testified that it was agreed that the corporation should have a total of 500,000 shares of which 125,000 were to go to him and his wife, 100,000 shares each to Allen and Dibert for their services in financing and operating the mine, and 175,000 shares to be sold to furnish capital for the operation of the mine. Allen and Dibert told the Moutiers that this stock would have to be sold in the East because the blue sky laws of California were "too tough."

Pursuant to this agreement, the corporation was organized in Arizona with Moutier as president, and appellant as secretary. These two, together with Dibert, constituted the board of directors. On December 12, 1936, the board held its only meeting. At that meeting the board authorized the issuance of 75,000 shares to Andrew Moutier and 25,000 shares to Iva his wife. The balance of 25,000 shares coming to the Moutiers was not then issued because of the side agreement that Allen and Dibert would sell those shares for the Moutiers at twenty-five cents a share. Allen testified that he and Dibert received 375,000 shares, and that 125,000 shares were issued to Moutier and his wife. The record is clear that Allen issued to himself half of the 375,000 shares. These figures are important because they support the inference that the plan from the first was a stock selling scheme, and that there never was an intent to finance the operation of the mine. Obviously, with all of the stock of the company in the hands of stockholders, none of the money received from the sale of the stock would be available to the corporation. The corporation had no stock in its treasury—its sole asset was the claims.

After the organization meeting Dibert and Allen came to California. In February of 1937 they were both brought

to the district attorney's office in Alameda County. At that time they had in their possession 330,000 shares of the capital stock of the company: These shares were in various units, and some were in Allen's name, some in Dibert's, and some in both their names as joint tenants. At this time Dibert and appellant were warned that the stock could not be sold in California without a permit. Allen assured the deputy that he knew the stock could not be sold without a permit, and that he had no intention of selling the stock in California.

Appellant testified that he paid to Moutier some $400 for back taxes on the mine property, and that he and Dibert paid attorney Stack $2,000 for his fees and expenses in connection with the incorporation. The attorney fixed the sum paid him at $1,000. Thus, at most, Dibert and Allen invested $2,400 in the corporation, for which they received 375,000 shares of its stock. The Moutiers received 125,000 shares for the claims. The only asset of the corporation was the claims. As already pointed out, it had no stock left that could be sold to finance operations.

After the corporation was created Allen and Dibert apparently attempted to interest various people in buying stock or in buying some of the mining claims. Some time prior to June of 1937 appellant met Walter Edborg, nephew of Eva C. Metz, at Santa Monica. Edborg had no money to invest but he told Allen about his aunt, Eva C. Metz, who, he thought, might have some money to invest. Edborg, Allen and Dibert came to Oakland early in June, 1937, and Edborg introduced them to his aunt. Allen tried to interest her in several propositions, among them being the purchase of some stock in the Castle Rock Gold Mining Company. Allen visited Mrs. Metz at her home on several occasions, sometimes accompanied by Dibert. Mrs. Metz was then seventy-three years of age. Allen took her out automobile riding and to various restaurants. He represented that the mine was very rich; that Dibert was a mining engineer; that he was a lawyer; that someone in the East had offered a million dollars for the mine; that it was worth more; that ore had already been "blocked out" (i. e., exposed on three sides) at the mine; that he knew a man in Illinois who owned some stock; that he, Allen, was authorized to sell it for $2,500. All these representations were false. When appellant discovered

that Mrs. Metz had no available cash he told her he was authorized to accept a piece of real property for the stock. Mrs. Metz, in reliance on these representations, agreed to exchange her Lawton Street property in Oakland for some of the stock. By a deed dated June 7, 1937, she deeded this property to Allen. This deed was executed in Los Angeles where she had gone with Allen at his request. Thereafter, through the mail, she received certificate number 46, dated June 18, 1937, made out in her name for 5,000 shares of stock in the Castle Rock Gold Mining Company. This certificate had been mailed from Prescott, Arizona, and was signed by Allen as secretary and Dibert as president of the company.

On June 18, 1937, Mrs. Metz received a telegram from Prescott, Arizona, signed by "Kellington Inc." offering to buy her 5,000 shares for sixty cents a share, and giving a box number at Prescott, Arizona, as the sender's address. The box number was the post office box of Leo Stack, attorney for the Castle Rock Gold Mining Company and for Allen and Dibert. Mrs. Metz replied to the telegram by letter which Stack, under date of June 28, 1937, returned to her unopened. Admittedly, the telegram was sent by appellant, Kellington being one of his many *aliases*. Admittedly, there was no such company by that name. Appellant testified that he had sent the telegram while under the influence of liquor.

After Mrs. Metz had received the telegram Allen again visited her. She told him about the telegram and expressed the thought that it was "phoney." He took the telegram and put it in his pocket but told her Kellington, Inc., was a very rich company.

Mrs. Metz purchased from Allen another block of 5,000 shares by transferring to Allen her Calaveras Street property. She received certificate No. 48 of the Castle Rock Gold Mining Company. This certificate is dated June 28, 1937, and was unsigned by the officers of the company. It was issued by Stack, the custodian of the books and records of the company, and mailed to Mrs. Metz with the statement that Allen and Dibert would no doubt supply the omissions in the certificate. Allen testified, however, as did Stack, that the intention was to issue a valid certificate. Stack issued certificate No. 48 to Mrs. Metz at the request of Allen and upon Allen returning to him a prior certificate

for 5,000 shares issued in the name of Helen Madison which had been endorsed over to Allen. The endorsement of Helen Madison's name on this certificate was admittedly made by Allen. The inference is clear that no such person as Helen Madison existed, and that the certificate had been made in her name to give the impression that there were other stockholders in the company.

In transferring the Calaveras Street property to Allen for the stock Allen had Mrs. Metz deed the real property to a dummy by the name of Hutchinson. Hutchinson then deeded the property to Allen. The deed to Hutchinson is dated June 5, 1937, but the acknowledgment by Mrs. Metz is dated June 25, 1937.

Mrs. Metz testified the properties transferred to Allen were each worth $2,500. Immediately after receiving the deeds to these properties both parcels were quickly sold by Allen, he receiving either $1,500 or $1,600 (the record not being entirely clear) for one parcel, and $1,250 for the other.

Various witnesses called by the prosecution testified as to similar representations made by Allen to them. This testimony clearly showed a common plan and scheme to defraud on the part of Allen.

There can be no doubt that the evidence demonstrates that Allen made many false and fraudulent representations to Mrs. Metz and that the deeds were transferred to him in reliance on these false and fraudulent representations. That evidence clearly supports counts one and two in the information. Appellant makes much of the fact that Mrs. Metz at one place in her testimony indicated that she had already agreed to transfer the Calaveras Street property before she received the bogus telegram. That telegram was sent June 18, 1937, and, although the deed is dated June 5, 1937, it was not acknowledged and apparently not delivered until June 25, 1937. Moreover, independently of that telegram, the other false and fraudulent representations heretofore set forth were made prior to June 5, 1937, and they alone are sufficient to sustain the conviction.

█ Appellant attacks Mrs. Metz's testimony on several grounds. In the first place, the defense produced an affidavit signed by Mrs. Metz on February 23, 1941, some eight days before the trial. This affidavit recites that she signed the complaints against Allen while acting under the threats of

a Mr. Easterday, who apparently had also defrauded her; that investigators of the district attorney's office had been frightening her; that they told her she must testify against Allen; that the deputy district attorney told her what she must say in court; that she was so mentally upset at the preliminary hearing, and so in fear of her life, that her testimony was not entirely truthful; that she did not rely on the telegram in purchasing the stock; that she has never believed that Allen intended to cheat her. The circumstances under which this affidavit was secured speak for themselves. On the morning of February 23, 1941, a Mr. Jackson appeared at Mrs. Metz's home. He represented that his sole purpose in coming to see her was to assist her in getting back her money. He took her to church and that afternoon took her to dinner in San Francisco and later for an automobile ride. Later in the evening he took her to a notary public in San Francisco and got her to sign the alleged affidavit, which she testified she never read. He told her that the only way to get her money back was to sign the paper. This affidavit found its way into the hands of the defense. There was evidence that Jackson had been seen with Allen several days before the trial. The defense made no attempt to produce Jackson as a witness. Mrs. Metz testified as to the circumstances under which the affidavit was secured, and went over it sentence by sentence and testified as to what was true and what was false. Her credibility, and whether her testimony at the trial was impeached by the affidavit, were obviously questions for the jury.

Appellant also objects to the method used by the deputy district attorney in the direct examination of Mrs. Metz. The witness was seventy-six years of age at the time of trial and obviously was confused and nervous. Frequently, after she had failed to testify on certain matters, the deputy district attorney would refresh her recollection by first letting her read portions of her testimony given at the preliminary hearing of Dibert several years before, and her testimony given at the preliminary hearing of Allen. After reading this former testimony, the former testimony was read aloud to her and she was asked if that former testimony refreshed her recollection and if that former testimony was true. The witness usually answered that her former testimony did refresh her recollection and that it was true. There can be no

doubt that the testimony thus read by, and to, the witness was used solely to refresh her recollection, and that as a witness in this case she testified as to the truth of these statements. This serves to distinguish such cases as *People* v. *Creeks,* 141 Cal. 529 [75 Pac. 101]; *Estate of Packer,* 164 Cal. 525 [129 Pac. 778]; *People* v. *Allen,* 37 Cal. App. 180 [174 Pac. 374], where the prior memorandum or testimony was sought to be used as evidence at the subsequent trial as to the truth of the facts there stated, and not solely to refresh the recollection of the witness. The law is clear in this state that where a witness called by a party fails to testify as to matters previously within his recollection, or gives evidence somewhat at variance with his former evidence, the party producing the witness may, with propriety, refresh the recollection of the witness by using the transcript of his previous testimony. (*People* v. *Durrant,* 116 Cal. 179 [48 Pac. 75]; *People* v. *Duncan,* 8 Cal. App. 186 [96 Pac. 414]; *People* v. *Izlar,* 8 Cal. App. 600 [97 Pac. 685]; *People* v. *Selby,* 198 Cal. 426 [245 Pac. 426].)

 Appellant urges that the alleged false and fraudulent representations were not in fact false and fraudulent. He claims the mine was not worthless and points out that he actually had an offer to buy it for a large sum of money. Actually this was an offer to buy the mine and to pay for it entirely out of royalties. The deal was never consummated. The evidence shows that each material representation made by appellant to Mrs. Metz was false and known by appellant to be false, and that such representations were relied upon by her in purchasing the stock. The existence of the nebulous contract to sell, and the estimates of the witnesses Moutier and Mitchell as to the value of the mine, were questions of fact for the jury. The jury knew that the old corporation had expended a large sum of money in developing the mine, and that the project was abandoned. The mine remained abandoned from 1911 to the date of trial. Under these circumstances, the jury was amply justified in its implied finding that the mine was worthless and that Allen knew that this was so.

 There can be no doubt that the evidence also supports the conviction on the third and fourth counts relating to the sale of stock in this state without a permit in violation of the Corporate Securities Act. Appellant urges that there

is no evidence that the stock was his individual issue, or that he was the underwriter thereof, and urges that an owner may sell his own stock without a permit. Such cases as *People* v. *Pace,* 73 Cal. App. 548 [238 Pac. 1089]; *People* v. *Lesser,* 123 Cal. App. 489 [11 Pac. (2d) 668]; *Ex parte Quarg,* 149 Cal. 79 [84 Pac. 766, 117 Am. St. Rep. 115, 9 Ann. Cas. 747, 5 L. R. A. (N. S.) 183], and *Pollak* v. *Staunton,* 210 Cal. 656 [293 Pac. 26], are relied upon to support this contention. Those cases undoubtedly permit the *bona fide* owner of shares of corporate stock, where such owner is not engaged in the business of buying and selling stock, to sell such stock without a permit. But those cases have no application here. In the present case the facts justify the legitimate inference that the corporate mechanism was used as the *alter ego* of Allen and Dibert for the purpose of defrauding purchasers of the stock. The evidence shows that appellant, Dibert and the Moutiers owned all the authorized stock of the corporation. Moutier took no part in the affairs of the company, except to participate in its organization. Shortly thereafter he resigned as president and director. Allen and Dibert completely dominated and controlled the corporation. They had given the corporation practically nothing in return for 375,000 shares of stock. Originally it had been intended that 175,000 shares should be sold for the purpose of financing the corporation, but Allen and Dibert had those shares issued to themselves so that there was no stock at all available to produce funds to finance the corporation. Under these circumstances the jury was warranted in finding that the corporation was the *alter ego* of Allen and Dibert, who dominated and controlled it. The jury was justified in inferring that the corporation was simply a means used by Allen and Dibert to assist them in selling this worthless stock to the public. There are many cases holding that under such circumstances a sale of the stock in this state without a permit violates the Corporate Securities Act. (*People* v. *Murphy,* 17 Cal. App. (2d) 575 [62 Pac. (2d) 592]; *People* v. *Smith,* 111 Cal. App. 177 [295 Pac. 105]; *People* v. *Ratliff,* 131 Cal. App. 763 [22 Pac. (2d) 245]; *People* v. *Craven,* 219 Cal. 522 [27 Pac. (2d) 906].)

Appellant also urges that it was error to permit Leo Stack, attorney for Allen and for the corporation, to testify

over appellant's objections as to certain facts which appellant contends were privileged. Appellant fails to set forth by reference to the transcript the facts to which he now takes exception. Nevertheless, we have read the record, including Stack's testimony. He was the statutory agent of the corporation and the custodian of its books and records, as well as being Allen's and Dibert's attorney. As such custodian Stack had access to the books and so gained the knowledge of their contents upon which his testimony was based. The facts testified to by him were not acquired as a result of the relationship of attorney and client. (*People* v. *Eiseman*, 78 Cal. App. 223 [248 Pac. 716].)

Appellant raises several contentions in reference to the statute of limitations. The offenses charged in the information were committed in June of 1937. The information was filed on November 28, 1940, three years and five months after the offenses were committed. The statute of limitations on the offenses charged is three years (§ 800, Pen. Code). Under § 802 of that code, however, ''no time during which the defendant is not an inhabitant of, or usually resident within this State, is part of the limitation.'' The information charged that after the commission of the offenses set forth therein the defendant ''fled from the State of California to the State of Pennsylvania and was absent from and outside the boundaries and jurisdiction of the State of California continuously from the 1st day of June, 1938, to the 4th day of August, 1939.'' The prosecution, in its case in chief, failed to introduce any substantial evidence on this issue. The defendant, as a witness on his own behalf, testified that, although he had made several trips outside the state, the total time he was outside the state during the period in question did not exceed ninety days; that at all times he lived and maintained a residence in Los Angeles at a designated bungalow court operated by his mother. His sister and brother-in-law, residents of San Francisco, offered some slight corroboration. Appellant failed to produce his mother as a witness, or to explain her absence. Appellant denied, or could not remember, a conversation had with the deputy district attorney and the arresting officers in which he admitted having fled the state, and in which he stated that he had lived outside the state during the period charged in the information. A stenographer was produced by the

prosecution in rebuttal who testified that she took down the conversation in shorthand, and that in that conversation appellant admitted being outside the state from June of 1938 to August of 1939, and stated in detail where he had been during this period. The arresting officer testified as to a conversation had with appellant immediately after his arrest in which appellant stated he had been out of the state during the period in question. Dibert testified that just before he was arrested in 1938 he had a conversation with appellant in Los Angeles in which appellant stated he knew a complaint had been signed against him and that the police were looking for him, and that he was going to get out of the state until he could get some money to "square" the charge. Obviously, this evidence not only constituted impeachment of appellant, but also constituted admissions against interest, which, if believed by the jury, as they apparently were, constituted direct evidence on the issue. ■ The mere fact that the prosecution should have introduced evidence on the issue in its case in chief but did not, and did not introduce such evidence except in rebuttal, in no way detracts from the evidence as direct evidence on the issue. (§ 1093, Pen. Code; 8 Cal. Jur., p. 237, § 305.)

■ Appellant also urges that the jury should have been instructed to make a special finding on this issue, and that where the information, as here, shows on its face that it is barred unless the allegation that the accused was out of the state for a designated period is supported, a general verdict of guilt is a nullity unless supported by a special verdict and finding in reference to the statute of limitations. This contention is without merit. While it is true that the legislature, by the passage of the various sections of the Penal Code relating to the statute of limitations, has declared it will not prosecute crimes after the period has run, and that such provisions limit the power of the courts to proceed in such cases (*People* v. *McGee*, 1 Cal. (2d) 611 [36 Pac. (2d) 378]), it is also true that in this case the information specifically charged that appellant was outside the state during a sufficient period to bring the prosecution within the three-year limit as defined in § 802 of the Penal Code, and that the evidence amply supports this allegation of the information. The verdicts returned by the jury found the appellant guilty of the specific charge contained in each count, and

748

each verdict contained the language "guilty . . . as charged in the . . . count [designating it] of the information." Each verdict was a general verdict. A general verdict of this nature implies a finding on all facts necessary to a conviction of the charge contained in the information. (*People* v. *Jochinsky*, 106 Cal. 638 [39 Pac. 1077] ; *People* v. *DuFault*, 1 Cal. App. (2d) 105 [36 Pac. (2d) 196] ; *People* v. *Flohr*, 30 Cal. App. (2d) 576 [86 Pac. (2d) 862].) This included that portion of the charge relating to the statute of limitations.

The fact that the statute of limitations is jurisdictional necessarily determines that a prosecution within the period specified is an essential element of the offense. Thus, the problem is essentially different from the defense of once in jeopardy. The Penal Code specifically requires a special plea in order that this defense may be raised (Penal Code, § 1016). If a special plea is not made, this defense is waived (*Rebstock* v. *Superior Court*, 146 Cal. 308 [80 Pac. 65] ; *People* v. *Solani*, 6 Cal. App. 103 [91 Pac. 654] ). But there is no provision of the Penal Code requiring or permitting a special plea in reference to the statute of limitations. A general verdict of guilty as charged, therefore, necessarily includes a finding on this element as it does in reference to the other elements of the offense.

This does not mean that it would have been improper for the jury to have brought in a special verdict on this issue. The code confers on the jury the power to bring in a special verdict under the proper circumstances (Pen. Code, § 1152), but that section makes this power optional with the jury (*People* v. *Smith*, 215 Cal. 749 [12 Pac. (2d) 945] ). There was no request by defendant for a special verdict on this issue.

Objection is made that the trial court improperly admitted evidence that appellant had made similar false representations to other people as those made to Mrs. Metz. The testimony of these various witnesses was admissible as tending to show a common plan, scheme and design to defraud in connection with the sale of worthless stock. (*People* v. *Morani*, 196 Cal. 154 [236 Pac. 135] ; *People* v. *Eppstein*, 108 Cal. App. 72 [290 Pac. 1054].)

The other contentions of appellant dealing with objections to the instructions given and refused, and also

dealing with alleged newly-discovered evidence, are so unsubstantial as not to require specific discussion. All such objections have been considered and found to be without merit.

The judgments and orders appealed from are, and each is, affirmed.

Knight, J., and Ward, J., concurred.