[Crim. No. 4673.   Second Dist., Div. Two.   Oct. 11, 1951.]

THE PEOPLE, Respondent, v. CLIFFORD I. TOPPIN, Appellant.

Claud B. Andrews for Appellant.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, S. Ernest Roll, District Attorney, and Robert Wheeler, Deputy District Attorney, for Respondent.

MOORE, P. J.—Appellant was convicted by the court without a jury on two counts of violating the Corporate Securities Act on September 1 and 2, 1950. One judgment was entered that he ''be punished by imprisonment in the County Jail of the County of Los Angeles for the term of one year. Sentences . . . to run CONCURRENTLY.'' Appellant demands a reversal of the judgment and the order deny-

ing his motion for a new trial on the ground that the evidence does not support the judgment.

In the summer of 1950 appellant visited Dorothy Pells, a retired graduate nurse, the prosecutrix, at her home where she loaned him $300 for which he gave her his promissory note for $350, payable in 10 days. On September 1, 1950, he telephoned her that "he had a surprise for me and that he wanted me to come down." She met him at a popular street intersection of Los Angeles where he showed her a paper "that he had invested my money . . . the $300 I had loaned him, instead of paying it back to me he had invested it in this . . . National Service Corporation . . . he hadn't asked me if I wanted to invest it in stocks or anything, but he had simply invested it . . . He said I was going to get in on the ground floor with all the other investors that had invested thousands of dollars in this corporation . . . he wanted me to put in more money . . . He said other members of the corporation wanted me to invest—make it $500 if I was going to get in on the ground floor where they were . . . he had a paper he showed me there in the restaurant that I was going to get wonderful returns for my money . . . when we got out home he wanted me to get $200 more and put it up . . . I gave him the $200. He gave me a note but I didn't see it . . . he put them in an envelope and sealed it up and told me to put it in a vault box . . . He wasn't satisfied. He knew I got my check from my Old Age Pension . . . and then he wanted that. And he never gave up until he got it . . . in the amount of $75 which I endorsed over to him."

After he left she opened the envelope. It had a promissory note for $500 dated Las Vegas, Nevada, and a stock certificate of National Service Corporation for 1,500 shares. On finding no security for the $75 she telephoned him and he told her to come down. She called at his office in the Story Building on Broadway. On her arrival he escorted her to a cafeteria for breakfast where he told her "that he had the man that was in his office make me out a security for my $75." When they returned to his office, appellant had his assistant make out a certificate for 100 shares in favor of Mrs. Pells, in the National Service Corporation for the $75 pension check taken the night before.

No part of the money received by appellant from the prosecutrix has ever been repaid her. No permit has ever been issued by the Division of Corporations to the National Service Corporation or to appellant.

## Was It His Personal Stock?

Appellant contends that while the evidence might justify a prosecution for another crime there was no proof that the shares issued to Mrs. Pells were the capital stock of the National Service Corporation or were sold or issued for its benefit; that they were owned solely by appellant. This requires an inspection and consideration of the corporate records.

The corporation was chartered by the State of Nevada for a total capitalization of 250,000 shares. On July 14, 1950, at Las Vegas, Nevada, certificates 1 to 4 of the corporation were signed in blank by the officers, Darrell R. Abbott as president and B. L. Smith as secretary. The latter was soon to become the bride of appellant. Neither the name of shareholder nor the number of shares, nor place or date of issuance appeared. On the next day, certificate No. 1 was filled in for B. L. Smith in the amount of 25,000 shares. On the same day she assigned that certificate to appellant and married him. No other events worthy of mention occurred at Las Vegas but on September 1, 1950, Toppin inserted in certificate 2 the name of Mrs. Pells, 1,500 shares, and Las Vegas, Nevada, as the place of issuance. On September 2 he inscribed ''Dorothy W. Pells'' in certificate No. 3 for 100 shares and ''Las Vegas, Nevada,'' as the place of issue. On September 3, ''B. L. Smith'' wrote appellant's name in certificate No. 4 for 23,400 shares. The stubs of such certificates contain corresponding data. Certificate No. 1 bears on its reverse side an ''assignment'' by B. L. Smith to C. I. Toppin. Certificates 5 to 8 inclusive, though signed by B. L. Smith and Darrell R. Abbott, are ''cancelled'' with ink and remain in the certificate book, but certificates 9 to 48 inclusive are unsigned and attached. Certificates 49 and 50 are detached.

The minutes of the corporation under date 15 July 1950 contain a recital of B. L. Smith's proposition to transfer certain mining properties in Yuma County to the corporation for 250,000 shares of its stock, and the resolution that the property ''was well worth the said amount of stock and had great potential value''; the proposition was accepted and the officers were directed to issue to B. L. Smith or order shares of stock ''in such amounts as may be requested.''

The corporate records and the conduct of appellant and his wife clearly disclose a carefully contrived scheme, plan and subterfuge to evade the provisions of the California

Corporate Securities statute. Among the records, minutes and papers of the company there was no document or minute showing an appraisal of the Yuma County mining properties; no affidavit or statement by any disinterested person to show an existing potential value of the mines acquired. No money was paid into the treasury on any account and no property situate in Nevada or California was transferred and not even a deed of the so-called mining property in Arizona is shown to have been received by the corporation. Not only did the corporation have no assets in which a shareholder could acquire an interest through stock ownership but promptly upon receipt of a stock certificate book, appellant proceeded to issue 25,000 shares to himself and race into California to commence his operations. ■ Whether the stock sold and pledged by appellant was his in fact and not a corporate asset was for the trial court's determination and if the facts proved and the inferences reasonably deducible therefrom justify the court's implied finding the judgment will not be disturbed. The trial court alone could determine whether the method and manner of appellant's procedure in effecting the sales to the prosecutrix prove that he did so in order to evade the penalties of the statute requiring a permit before corporate shares may be issued. ■ In deriving its finding that appellant was acting for the corporation in issuing the shares to Mrs. Pells, the court was not confined to appellant's testimony, but it was obliged to consider the surrounding circumstances in determining whether he was owner or was acting for the corporation and whether the sales were made in the manner chosen by appellant to evade the force of the statute. (*People* v. *Smith,* 111 Cal.App. 177, 179 [295 P. 105].) If appellant was not selling for the corporation, why did he say to his victim that she was going to get in on the ground floor, that the other investors who had ''invested thousands of dollars in the corporation wanted her to put in more money,'' that ''other members wanted her to invest $500''? Appellant is the author of those statements and thereby he put forth the corporate wish for the retired nurse's investment. Such statements forcefully indicate that appellant intended to convey the impression that he was acting on behalf of the corporation.

■ Appellant conceived and brought into being his corporation. He maintains it as sole owner. In view of all the circumstances, the court was amply supported in finding that in issuing certificates 2 and 3 to Mrs. Pells, appellant

sold the stock in violation of law; that he issued the stock in pursuance of his fraudulent plan "for the direct or indirect promotion of a scheme and enterprise with intent to violate and evade the act"; that since he was sole owner of the corporation which was fraudulently conducted to evade the law, the corporation may be deemed to be the *alter ego* of appellant and for the purpose of maintaining a compliance with the statute, he may be considered as issuer of the stock.

Judgment and order denying his motion for a new trial are affirmed.

McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 7, 1951.