[Crim. No. 4839. Second Dist., Div. Two. Nov. 26, 1952.]

THE PEOPLE, Respondent, v. OLIN E. DARBY, Appellant.

Bates Booth and Joseph Scott for Appellant.

Edmund G. Brown, Attorney General, Dan Kaufmann, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), and Mark Brandler, Deputy District Attorney, for Respondent.

MOORE, P. J.—While he was a member of the Los Angeles Board of Education appellant was indicted on three counts, each accusing him of having an unlawful interest in a contract executed by the board. Count I alleged a contract between the board and the Jack and Jill Ice Cream

Company, a partnership herein referred to as Jack and Jill, and that it was contrary to the provisions of section 1011 of the Education Code and section 1090 of the Government Code. He was convicted on count I but acquitted on counts II and III which alleged kindred charges with respect to certain printing contracts. Proceedings were suspended and appellant was granted probation on condition that he pay a fine of $1,000. He appealed from the judgment, the order denying his motion for a new trial, the intermediate orders made by the judge, the order denying appellant's motion in arrest of judgment, and the verdict. Since the several orders and the verdict are nonappealable, the appeals therefrom will be dismissed and the various attacks upon the verdict will be considered along with the judgment and the motion for a new trial. (*People* v. *D'Elia,* 73 Cal.App.2d 764, 766 [167 P.2d 253]; Pen. Code, § 1237.)

### The Background

Appellant's appointment to membership on the Los Angeles Board of Education was on May 27, 1947. He was president of the board for the school year July 1, 1948 to June 30, 1949. He was elected to succeed himself for the four-year term commencing July 1, 1951. However, he had not arrived at a general election before the commencement of the series of events recited herein.

In 1949 appellant was owner of a vacant store on Third Street in Los Angeles. In June he telephoned the office of David Bresler, member of the firm of Jack and Jill. When Bresler returned the call, appellant informed him of his vacant store and commended it as a good location for commencing an ice cream business. Bresler sent Mr. Olin, general manager of Jack and Jill, to inspect the store. Late in June, 1949, Mr. Olin introduced Bresler to appellant at the board's office as a partner in Jack and Jill. Appellant followed the introduction with an inquiry whether Bresler would be interested in bidding on school ice cream business. Indeed, he would, if there was a chance. Appellant could help him get it if Jack and Jill were the low bidder. Appellant thereupon injected into the discussion the leasing of his vacant store and quoted a rental of $300 monthly and suggested his earnest desire to procure a good tenant.

Arrangements were completed for appellant to draw the lease on the Third Street property by inserting as lessee the name of one Wass, an employee of Jack and Jill. Bresler would send appellant a check for $600 dated June 24, 1949,

in payment of the first and last months of the lease term. On receipt of the lease signed by appellant, Bresler had Wass execute it. Appellant received the executed lease and the $600 check. The $300 was received monthly by appellant until February, 1950. The premises were used as a retail dispensary of the products of Jack and Jill whose name was on the outside.

On July 1, 1949, appellant was by President Elliott duly appointed chairman of the insurance committee. He promptly called Elliott's attention to his former request to be appointed chairman of the purchasing and distribution committee, herein referred to as the purchasing committee. Thereupon the president withdrew his appointment of Earle D. Baker from the coveted chairmanship, appointed him to the insurance committee, and named appellant as chairman of the purchasing committee. Among the duties of the latter committee is that of receiving the tabulation sheet containing a summary of ice cream bids, the names of bidders and other items on which they have bid and the prices of the bidders. On receipt of such summaries, the purchasing committee forwards its recommendations to the board which accordingly makes the awards of contracts. The purchasing committee convened on August 4, 1949, to consider the bids on ice cream contracts. They found Jack and Jill had made the low bid, and that bid had already been agreed to by all the other bidders. By reason of the committee's inability to find one bidder alone capable of supplying the total output required, the committee decided to allocate the business among all the bidders. There followed a discussion among the members as to whether Jack and Jill, a newcomer to Los Angeles and relatively unknown, should be given more than a token award. Appellant took the position that since Jack and Jill had put in the low bid which had been met by all the other bidders, it should have more than a token amount and suggested it be given 20 per cent, or about $90,000 a year. Appellant's proposal was adopted by the purchasing committee whereupon he signed the committee's report dated August 22, 1949, recommending the purchase of ice cream from various bidders including Jack and Jill for the year following September 1, 1949. Thus Jack and Jill received 20 per cent of the gross ice cream sales to the board for the year, which paid them $68,250.18.

While some evidence was adduced that the fair monthly rental value of the Third Street store in July, 1949, was

$300, other proof showed it did not exceed one-half that sum. An expert witness testified that it was worth less than $300 per month. While appellant received checks for $300 each month in payment of his lease, Blagg and Bresler, the lessees of Jack and Jill, paid the latter only $125 per month for a portion of the lease term, thereby requiring Jack and Jill to absorb the differential. In February, 1950, appellant offered to lease the store to Blagg at $125 a month. Another witness testified that the successor of Blagg and Bresler obtained a lease at $250 rental monthly, and that appellant consented to reduce it to $175.

Appellant did not testify.

However, on this appeal, he submits that the proof is insufficient and the law is not adequate to warrant appellant's conviction for violating section 1011 of the Education Code and sections 1090 and 1097 of the Government Code in that he was "interested as a member of the Board of Education . . . in a contract for the purchase of ice cream products made by the said Board. . . ."

### The Indictment and the Statutes

Appellant was accused by indictment of "willfully and knowingly being interested as a member of the Board of Education in a contract for the purchase of ice cream products made by the said Board" with Jack and Jill, all in violation of sections 1090 and 1097 of the Government Code[1] and section 1011 of the Education Code.[2]

Appellant contends that the Education Code pre-empts the

---

[1]*Government Code*

*Section 1090:* "Members of the legislature, state, county, judicial district and city officers shall not be interested in any contract made by them in their official capacity, or by any body or board of which they are members."

*Section 1091:* "State, county, judicial district and city officers shall not be purchasers at any sale nor vendors at any purchase made by them in their official capacity."

*Section 1092:* "Every contract made in violation of any of the provisions of Sections 1090 and 1091 may be avoided at the instance of any party except the officer interested therein."

*Section 1097:* "Every officer or person prohibited by the laws of this State from making or being interested in contracts, or from becoming a vendor or purchaser at sales, or from purchasing scrip, or other evidences of indebtedness, who violates any of the provisions of such laws, is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the State prison for not more than five years, and is forever disqualified from holding any office in this State."

[2]*Education Code*

*Section 1011:* "No member of the governing board of any school dis-

field of interests prohibited to school boards; that school-board members are not subject to the parallel article of the Government Code; that each unit of legislation is complete within itself and does not overlap; that if the Legislature had intended the Government Code to apply to school boards, the provisions of the Education Code would be meaningless; that the specific controls the general. Appellant contends that the framing of the accusation against him under section 1090, Government Code, is a distortion of that statute; that inasmuch as the Legislature has adopted an Education Code and included in it section 1011 specially designed to inhibit a school-board member from having an interest in a contract made by the board, having the prohibited interest may be illegal, but not a crime. The feature of section 1014 which appeals with emphasis to appellant is that it makes the act of which he stands accused a misdemeanor. Because of this clear provision applicable to school trustees, appellant contends that the court below erroneously instructed the jury that a violation of section 1011, Education Code, is a felony under section 1097 of the Government Code, and that because the lawmaker "set out the consequences of a disobedience to his will, no other consequences can be logically and fairly considered as coming within the scope of his intention." (*Bird v. Dennison,* 7 Cal. 297, 307.) Appellant concludes from the quoted decision and statutory provisions that the only remedy applicable to a school trustee who votes on a contract in which he has an interest is civil (§ 1013) and that since no punishment is annexed, the interest prohibited by section 1011 may be illegal, but it can be no crime because a penalty is necessary to constitute a crime. (Pen. Code, § 15.) From the conclusion thus derived appellant generalizes that no felony conviction can be had for the violation of a section of the Education Code for which no penalty is provided.

It would be pleasing to decipher the codes as appellant's

---

trict shall be interested in any contract made by the board of which he is a member."

*Section 1013:* "Any contract made in violation of Sections 1011 or 1012 is void."

*Section 1014:* "The offering of any valuable thing to any member of the governing board of any school district, with the intent to influence his action in regard to the granting of any teacher's certificate, the appointment of any teacher, superintendent, or other officer or employee, the adoption of any textbook, or the making of any contract to which the board of which he is a member is a party, or the acceptance by any member of the governing board of any valuable thing, with corrupt intent, is a misdemeanor."

counsel has done. At first blush it might appear that, after the Legislature has solemnly enacted statutes for the governance of those who conduct the affairs of a school district and set them up in buckram as "Education Code," the law-enforcing agencies would forego consulting the Government Code, the Penal Code or any other code and apply only the remedies provided in the Education Code. ▮ But to reason so is to indulge in interpreting the codes with a squinted view. The laws have been codified for the convenience of the people. All of them combined speak for the sovereign power and all constitute but a single statute. (*In re Porterfield,* 28 Cal.2d 91, 100 [168 P.2d 706, 167 A.L.R. 675].) There is no rule of statutory construction that requires the courts so to construe a statute as to render it invalid. The reverse is more nearly the rule.

▮ It is true that section 1097 applies to all public officers, but does not a school trustee come within that classification? To exclude him from the class of "all public officers" would be to defy the express mandate of the Constitution. (Art. I, §§ 11 and 21; art. IV, § 25.) Those provisions require all laws of a general nature to have a uniform operation and forbid the Legislature to confer special privileges or immunities or to impose a less penalty on one class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the particular subject of the law. (5 Cal.Jur., p. 797, § 180.) Indeed, why should a member of a school board with its immense constituency and wealth be exempt from the operation of the Government Code or the Penal Code after he has violated their inhibitions if a city councilman or a supervisor must be punished for voting on a contract in which he had an interest? He is a member of a "body or board" forbidden to have an interest (§ 1090) and he is a "person prohibited by the laws of this State from making or being interested in contracts" and has violated "provisions of such laws." (§ 1097.) If the Legislature had intended to restrict the application of 1097 to any particular group or class of officers, it could easily have done so by the use of simple words instead of saying "every officer or person . . . who violates any of the provisions of such laws . . ."

Appellant contends that the rule of *expressio unius* emphatically applies by reason of the absence of "school board member" or "school trustee" from those forbidden by section 1090 to be interested. Such contention ignores the provisions of the Los Angeles city charter which provides for the manner

and times of electing board members, their terms of office, their number and qualifications, their compensation and removal. Pursuant to such power granted by the Constitution (art. XI, § 8½, subd. 2) the city provided for the board of trustees of the city school district and included them in the list of "City officers." (Stats. 1925, p. 1039; Los Angeles city charter, art. II, § 5.) ■ While the school system is a matter of general concern and the members of a board are governed by state laws, yet with respect to their election, tenure and removal, they are municipal officers (*Becker* v. *Council of the City of Albany*, 47 Cal.App.2d 702, 705 [118 P.2d 924]) and therefore subject to section 1090 et seq. of the Government Code. ■ ■ Furthermore, members of the Los Angeles board of education are "state officers" referred to in section 1090. The quoted phrase applies to all persons "clothed with functions affecting the public" which functions deraign from state laws. (21 Cal.Jur., p. 829, § 13.) ■ An officer is a state officer if the tasks performed by him are accomplished for and on behalf of the state notwithstanding the fact that his duties were restricted to a particular geographical portion of the state. (*Milliken* v. *Meyers*, 25 Cal. App. 510, 514 [144 P. 321].) ■ The school district is a state agency and its board members are state officers. (*People* v. *Richards*, 86 Cal.App. 86, 94 [260 P. 582].)

■ If the contention of appellant that officers not specified in section 1090 are thereby excluded, all the trustees and directors of reclamation, flood control, swampland, sanitary and levee districts would have no law to nullify their contracts authorized by the vote of those having an interest. Upon no rational hypothesis could the Legislature have intended that a trustee of any of such districts should be privileged to have an interest in a contract to be adopted by the district. Clearly then, such a trustee is either a state or county officer and as such is under the ban of section 1090, and if guilty is punishable pursuant to section 1097. If a trustee of any of the several classes of districts mentioned in the first sentence of this paragraph is amenable to the cited statutory provisions of the Government Code, then there is no reason why the trustee of a school district should not be likewise subject thereto, unless he may be excused by reason of the existence of the Education Code. But there is no inconsistency between the two codes.

■ Merely because section 1014 applies only to the "governing board" of a school district, its members are not thereby

divested of their status as officers of the state. The Education Code, section 1014, makes it a misdemeanor for a member with corrupt intent to accept a valuable thing from a bribe giver, whereas the Government Code makes it a crime for any "officer or person prohibited by the laws of this State" from being interested in contracts adopted by his governing body.

The two codes are not antagonistic laws, but both are parts of the state's jurisprudence and must be harmonized and effect given to every section. (See *People* v. *Seeley*, 137 Cal. 13, 15 [69 P. 693].) What the Legislature says is the law, wheresoever it be found. If section 1014 should be declared a specific statute applicable only to trustees of a school district, then it would necessarily at the same time be held invalid as subjecting them to a less penalty than must be applied to other public officers for the same offense. (See *Ventura County Harbor Dist.* v. *Board of Supervisors*, 211 Cal. 271, 276 [295 P. 6].) Appellant astutely argues that all legal effects intended by the Education Code are stated therein and that criminal penalties may not be imported from the Government Code, citing 23 Cal.Jur., p. 741, § 118; *Matter of Ellsworth*, 165 Cal. 677, 681 [133 P. 272]; *Perkins* v. *Thornburgh*, 10 Cal. 189, 191. In those decisions the courts found as a matter of law a special statute controlled a general statute.[3] Section 1014 was not intended to be a special statute designed to negate or uproot section 1097 of the Government Code. It was enacted as section 104 of the school law in 1870. (Stats. 1870, ch. 556, p. 824.) It was amended in 1876 by changing the language "shall be, *directly or indirectly* interested" by omitting the italicized words and has come down to the Education Code in the same form. Sections 1090 to 1097 were made a part of "an Act to Prohibit Officers from Being interested in Certain Contracts" adopted May 1, 1851. In 1872 it was made into sections 920, 921 and 922 of the Political Code, and section 71 of the Penal Code. In 1943 the three sections were enacted as sections 1090, 1091 and 1092 of the Government Code, and section 71 of the Penal Code was placed in the Government Code as section 1097. But search the

[3]For illustration, in the *Matter of Ellsworth*, after the Board of Supervisors had enacted Ordinance No. 89 regulating saloons in Sonoma county, an initiative ordinance was adopted limiting the issuance of licenses to bona fide hotels. Mr. Ellsworth procured a license under Ordinance 89 for operating a saloon in county territory. While he was accused of violating the initiative ordinance, the authorities undertook to apply the provisions of Ordinance 89 with which he had complied. They failed at invoking the initiative ordinance because it provided no penalty.

history of the two statutes as one will, the researcher always comes up with the discovery that it has been the constant policy of this state from the beginning to make it a crime for an officer to make a contract on behalf of a public agency while he is interested in the subject matter of the contract. The fact that the lawmakers caused section 1097 to be placed in the Penal Code in 1872 indicates a legislative intent to have it apply to *all* violators.

SECTIONS 1011 OF THE EDUCATION CODE AND 1090 AND 1097 OF THE GOVERNMENT CODE ARE CONSTITUTIONAL.

Appellant contends that if these sections are construed to create a crime they would cause the punishment of a person for the act of others whom he cannot control. It is true that there can be no crime in the absence of a statute requiring an act or forbidding an omission. However, in taking the measure of the statutes here under consideration, it must be kept in mind that the act denounced is the ''possession of an interest.'' The quoted phrase does not signify that a member of the board of education is merely inhibited from sharing directly in the profits or advantages to be derived from a contract made by the board in its official capacity. It means that a member is forbidden to enter into any business relation or arrangement with a person that will tend to cause the member to favor such person when any contract with the school district proposed by such person shall be presented for the board's approval. It does not require the member to acquire a transferable interest in the forbidden contract before he may be amenable to the inhibition of the statute, but if the member is for any reason placed in such position that he prefers the execution of a proposed contract more than he desires the public good to be served, then he is interested. And when the board authorizes the contract, such member violates sections 1090 and 1097. Sound public policy dictates that these officers shall be denied the right to have any personal interest in contracts negotiated by them in their official capacity. Such policy is obviously premised on the ancient truism that one cannot faithfully serve two masters at one and the same time. Statutes such as section 1011 carry out this policy by insuring that the public officer will not be placed in a position in which his private interests might tempt him to uphold with less vigor the interests of the public. (See *Noble* v. *City of Palo Alto,* 89 Cal.App. 47, 51 [264 P. 529]; *Stockton Plumbing & Supply Co.* v. *Wheeler,* 68 Cal.App. 592, 600

[229 P. 1020].) Making null a contract created by the board of education by virtue of the very act of confirming it was deemed by the Legislature to be an insufficient deterrent. By fixing the penalty prescribed by section 1097 for a violation, the Legislature acted within the scope of its authority. Had it not done so, crisis after crisis would arise, wicked men would usurp the power and purloin the purse of the district, leaving the public ultimately helpless and in the grasp of brigands. There is no compulsion for a man to become a board member, and when he does so, he is not obliged to make alliances with others who plan to engage in a transaction with the board.

Appellant asserts that ''the annexation of Government Code section 1097'' to section 1011 of the Education Code, thereby making the act a crime, constitutes an inescapable legal trap; that all the essential elements of a crime are absent from 1011; that by a member's having an interest, section 1011 merely creates a status; that by the innocent vote of the board, such innocent status is immediately made into a crime even though such interest-holding member be absent at the time the fatal vote is taken. Appellant, however, cites no pertinent authority in support of his thesis and his argument is based upon unauthorized assumptions. He is not being punished for the acts of others. Viewing the statute in a reasonable light, it is seen that the act which creates the public offense is the defendant's creation of a situation whereby he becomes interested in a public contract while he is a member of the board. The interest comes under the ban of section 1090 whether the member brings about the situation or continues to be interested after knowledge of its existence. For a school trustee to have an ''interest'' in a contract he is not required to share directly in the profits to be realized. He has an interest the moment he places himself in a situation ''where his personal interest will conflict with the faithful performance of his duty as trustee.'' (*Moody* v. *Shuffleton*, 203 Cal. 100, 105 [262 P. 1095]; see, also, *Miller* v. *City of Martinez*, 28 Cal.App.2d 364, 370 [82 P.2d 519]; *Stockton Plumbing & Supply Co.* v. *Wheeler*, 68 Cal.App. 592, 602 [229 P. 1020]; *Hobbs, Wall & Co.* v. *Moran*, 109 Cal. App. 316, 319-320 [293 P. 145].) A board member must refrain from intentionally causing himself to be interested in a contract and if by chance he discovers he is interested prior to official action he should divest himself of such interest or avoid criminal liability by resigning from his office. The law does not concern itself with the nature of the contract and

criminal responsibility is assessed without regard to whether it is fair or oppressive. In any event, the Legislature did not exceed the scope of its authority in enacting such measures to protect the public interest.

Appellant contends that his own lawful status may, by invoking the penalty provided by section 1097 of the Government Code, be converted into a crime by the board's lawful act in awarding a contract to the lowest responsible bidder. While it is true that the Education Code, section 18051, requires the board to award the contract to the lowest responsible bidder, appellant's argument is fallacious in that the board is prohibited from awarding a contract in which a member has an interest. (§§ 1013 and 1090, *supra.*) By virtue of such interest of a member at the time of the award the statutes are violated by all members who have knowledge of such interest. In the second place, to say that appellant had no control over the action of the board is to ignore a basic presumption, to wit, that members of the board who are disinterested in a contract will do their duty, and refrain from voting to award a contract in which another member is interested.

Appellant attacks sections 1090 and 1097 as invalid in that they do not require a specific criminal intent. The absence of such requirement does not apply to crimes based on public policy. To save the state from certain acts universally deemed to be inimical to the public welfare, it is sufficient if the act is forbidden and a penalty is prescribed for its violation. The intent is imputed. (*People* v. *Pearson,* 111 Cal. App.2d 9, 18 [244 P.2d 35].) It is also contended that the last cited sections are invalid because they are uncertain, vague and indefinite; that in defining an offense the Legislature must use language that will not deceive the common mind, citing *Winters* v. *New York,* 333 U.S. 507, 515 [68 S.Ct. 665, 92 L.Ed. 840] ; *Connally* v. *General Const. Co.,* 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322]. The answer to such contention is that it is necessary only that the words used in the statute be well enough known to enable those persons within its reach to understand and correctly apply them. "To make a statute sufficiently certain to comply with constitutional requirements it is not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited." (*Lorenson* v. *Superior Court,* 35 Cal.2d 49, 60 [216 P.2d 859].) The rule of strict construction of penal statutes is abolished. They must be construed according to the fair import of their terms with a view of promoting jus-

428

tice. (Pen. Code, § 4; see *People* v. *Ovieda*, 106 Cal.App.2d 690, 693 [235 P.2d 612].) "... . In determining whether a penal statute is sufficiently explicit to inform those who are subject to it what is required of them the courts must endeavor, if possible, to view the statute from the standpoint of the reasonable man who might be subject to its terms." (*Pacific Coast Dairy* v. *Police Court*, 214 Cal. 668, 676 [8 P.2d 140, 80 A.L.R. 1217].) No reasonably intelligent person can fail to understand the meaning of "interest" or the significance of "contract." Both are of frequent use in the market place as well as in the counting house. Inasmuch as the language employed in the statutes under attack is clear and the words are such as a person of average intelligence can understand, it must be held that there is no want of certainty or definiteness in them. But mere difficulty in ascertaining the meaning of the words employed or the fact that the language is ambiguous will not invalidate a statute. (*Pacific Coast Dairy* v. *Police Court, supra.*) It must be upheld unless its nullity clearly, positively and unmistakably appears. (*Lockheed Aircraft Corp.* v. *Superior Court*, 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].) Neither is a statute void for vagueness and uncertainty if its meaning may be inferred or because the legislative intent might have been declared in plainer terms. (50 Am.Jur., 489, 490; *Hunt* v. *State*, 195 Ind. 585 [146 N.E. 329, 330].)

That appellant had an interest in the board's contract with Jack and Jill will appear in the discussion of the evidence.

### FACTS SUFFICIENT

Assuming for the moment that the law was correctly interpreted by the trial court, the labors of this court on the question of the sufficiency of the proof are abbreviated by the long-established policy of appellate procedure which binds a reviewing court to take the verdict or the findings as determined by the court below. Only when, as a matter of law, no substantial legal evidence can be found in the record, may the appellate court set aside a verdict. The court must assume as true the existence of every fact which the jury could reasonably have found, every fair inference which it could have deduced. (*People* v. *Deysher*, 2 Cal.2d 141, 149 [40 P.2d 259].) The same court went a step further in *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778], where it declared that before the verdict of a jury which

has been approved by the trial court, can be set aside upon the ground of insufficiency of the evidence, "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." In the same decision, the court announced that the mere fact that circumstances which convicted the accused might reasonably be reconciled with his innocence would not justify the appellate court in molesting the verdict.

Now, not only did the State prove a series of facts and circumstances which, if believed, make appellant's guilt palpable, but despite the scorpion-like shadows that lowered over the drama he steadfastly maintained his silence; neither denied nor explained. Hence, so far as the facts are concerned, "however devious and winding the chain may be which connects the officer with the forbidden contract, if it can be followed and connection made," he is guilty of being interested in the contract at the time he, as a board member, voted for it. (See *People* v. *Deysher, supra,* 146.)

Not only did appellant vote for the contract with Jack and Jill, but the jury believed the evidence that he solicited it and before sitting in judgment upon it he had leased his vacant store to the ice cream company at a generous rental and so engineered the proceedings of the purchasing committee as to make certain the allocation to Jack and Jill of a large share of the board's ice-cream business for the ensuing year. Had he not telephoned the office of Jack and Jill at first? Had he not followed that call with proposals to lease the vacant store? Had he not drawn the lease and put Jack and Jill in possession of the place? Had he not caused them to submit a low bid to supply the ice cream? Had he not caused his own appointment as chairman of the purchasing committee and induced his committee to include Jack and Jill among the contractors to share in the schools' ice cream business? But for such aggressive activities, it is not likely that the world would ever have known that appellant owned a vacant store or that his zeal to make it a paying investment would clash with his loyalty to the board of education. But the evidence adopted by the jury was sufficient to convince them that appellant had such an interest in the ice cream contract as would tend to prevent his exercise of a jealous concern for the best interests of the school district. In fact, the jury evidently believed that appellant's interest in Jack and Jill and their perma-

nency as tenants of his store did influence his conduct as a trustee. So believing, their verdict that he violated section 1097 was based on legal evidence. (*Raymond* v. *Bartlett,* 77 Cal.App.2d 283, 286 [175 P.2d 288] ; *Salada Beach Public Utility Dist.* v. *Anderson,* 50 Cal.App.2d 306, 309 [123 P.2d 86] ; *Moody* v. *Shuffleton,* 203 Cal. 100, 105 [262 P. 1095].)

Appellant asserts with emphasis that there is no evidence that he was a landlord of Jack and Jill. It is true that no written lease was adduced or conversation proved showing that appellant leased his store to that partnership. But it cannot be denied that the jury drew a reasonable inference in concluding that the lease was given to Irving Wass as agent of Jack and Jill. Appellant's telephone call to Bresler of Jack and Jill that he desired a tenant for his vacant store; Bresler's return call and visit; agreement between the two on the terms of a lease and that the writing should name an employee of the partnership as lessee; the use of the store as a retail dispensary of Jack and Jill products with that name on the exterior of the building; appellant's receipt of rental checks from the office of Jack and Jill signed by Bresler Ice Cream Company, per David Bresler —such evidence and appellant's silence justified a rational inference that Jack and Jill was in fact the lessee. That deduction is further supported by the evidence that when appellant desired an advance on the rental he contacted Bresler at the Jack and Jill office and promptly received from the company a cashier's check for the advance payment of rent.

There is no proof that Wass ever paid rent on appellant's store. While the partnership of Blagg and Bresler operated their ice cream business at that location, there is no conclusive proof that they were tenants of appellant. *That firm did not exist at the time of Bresler's arrangements with appellant for the lease or when the lease was made to Wass or when appellant received the $600 cashier's check for the first payment on the lease.* Appellant can readily see that such circumstances warrant the inference that Jack and Jill was, in truth, his tenant. ■ Indeed, in determining whether appellant had an interest in the ice cream contract, the jury was not required to take his bare denial or his explanation, but it was their function to explore the mist of conflicting evidence and find the vital, ultimate fact. (*People* v. *Deysher,* 2 Cal.2d 141, 146 [40 P.2d 259].)

In support of his claim, appellant contends that his purpose in having Jack and Jill bid on the ice cream contract was to bring about "a crack in the monopoly" and as a result of that bid the school year of 1949-1950 saved $72,000 and substantial savings for subsequent years and that such savings inured to the benefit of the children. While the price of a school lunch was reduced from 25 cents to 20 cents in the spring of 1949—prior to the Jack and Jill contract— yet after the contract and within the very next school year the price of a school lunch was raised back to 25 cents. Such facts were not calculated to induce the jury to adopt appellant's theory that he had caused Jack and Jill to bid on the ice cream contract to break the ice cream monopoly and save thousands of dollars to the district and its constituency. And whatever virtue might be ascribed to the Jack and Jill contract the jury were not obliged to accept it as conclusive proof that appellant had no prohibitive interest in the contract.

## WAS THE INTEREST PROHIBITIVE?

Appellant extends his artful argument to include the contention that an officer to be "interested" in a contract in the statutory significance of the word must participate in the advantages or detriments resulting from the contract. In support of his thesis he cites *Martin Bros.* v. *City of Concord,* 110 Cal.App.2d 215, 217 [242 P.2d 406] ; *Escondido Lumber, H. & G. Co.* v. *Baldwin,* 2 Cal.App. 606, 608 [84 P. 284].) Such authorities are distinguished on their facts. The city councilman of Concord could not have been influenced with respect to the contract for the reason that the interest was not yet in existence. In the latter decision the court observed : "The mere fact that the contractor, without previous arrangement, or agreement, saw fit to buy of a corporation, for which one of the trustees was an agent, certain materials used in the construction of the house, would not render the contract void, voidable, or ordinarily subject it to merited criticism." In other words, argues appellant, if the officer has a direct and present interest in a contract from which he will profit, he violates the statute by voting for the contract (*People* v. *Deysher, supra*), but if he has merely a potentially pecuniary benefit although he actually receives the benefit after the contract is executed, the interest is not prohibited. But controversies cannot be adjudicated by formulae. Whether a trustee holds a prohibitive interest at the time he votes for a contract must be determined from

432

all the facts existing at the time of its adoption. (*People* v. *Deysher, supra,* 149; *Tuscan* v. *Smith,* 130 Me. 36 [153 A. 289, 294, 73 A.L.R. 1344]; *Yonkers Bus Inc.* v. *Maltbie,* 23 N.Y.S.2d 87, 90-91.) If the facts in the instant case fairly warranted the finding that appellant created the relationship of landlord and tenant between himself and Jack and Jill with the purpose of using his influence on the board of education to get some ice cream business awarded to his tenants, then their implied finding that he had a prohibitive interest cannot be upset. The decision in *Commonwealth* v. *Strickler,* 259 Pa. 60 [102 A. 282], is not authority: (1) it did not have such florid facts to show interest; (2) it is contrary to the statutes here involved. (See *Moody* v. *Shuffleton,* 203 Cal. 100 [262 P. 1095]; *Stockton Plumbing & Supply Co.* v. *Wheeler,* 68 Cal.App. 592, 603 [229 P. 1020].)

 In the case at bar, all negotiations for the lease and payment for the first and last months' rental on the store were complete, appellant had suggested to Bresler that he bid on the ice cream contracts and had promised his support in obtaining the ice cream business. From those facts it was reasonable to find that appellant's interest existed when the board awarded Jack and Jill the contract.

The statutes are general in prohibiting an officer from being interested in a contract. He must not place himself in a position where his personal interest will conflict with his faithful performance as trustee and, however so fair the contract may appear to be, the trustee will not be suffered to occupy a position so equivocal and so fraught with temptation. (*Moody* v. *Shuffleton, supra,* 104.) Precedent is of little value except as an analogue. Whether an officer or board member was interested at the time he or his board made the contract is a question for determination in each controversy. If the jury were convinced by all the evidence that appellant intentionally created a situation whereby he became interested in the contract to be awarded by the board and that he actively participated in effectuating the contract their verdict cannot be upset. The proof reasonably warrants findings that appellant not only had knowledge of his interest, but strove to transmute it into material gain.

INSTRUCTIONS NOT PREJUDICIAL

The discussion of "interest" brings us to appellant's attack upon the jury instructions. The prejudice, he asserts, was aggravated by the fact that the prosecution tried two cases,

to wit, (1) for the defendant's acceptance of a bribe; (2) for defendant's having an interest in the contract. Appellant says that his conviction for having an interest was due solely to the suspicion and prejudice aroused by the charge of bribery and the court's "contradictory" instructions.[4] *A* was given at the request of the People; *B* and *C* were requested by appellant. If the jury had believed the facts as contended

---

[4]Instruction *A*

"The word 'interested' as used in Government Code Section 1090 and Education Code Section 1011 means any influence which might interfere with a board member's unqualified devotion to his public duty. The interest may be direct or indirect and includes any monetary or proprietary benefits, or gain of any sort, or the contingent possibility of pecuniary benefits.

"The interest is direct when the board member, in his official capacity, does business with himself in his private capacity.

"The interest is indirect when the board member enters into a contract in his official capacity with a business firm, which business firm, by reason of the board member's relationship to it at the time the contract is awarded, is in a position to render actual or potential pecuniary benefit to the board member based on the contract the business firm has received."

Instruction *B*

"In order to find the defendant OLIN E. DARBY guilty of the crimes alleged in the indictment, you must find beyond a reasonable doubt and to a moral certainty that the defendant has 'a pecuniary or proprietary interest' in the contracts alleged in Counts I, II and III of the indictment.

"It is not sufficient to find that the defendant OLIN E. DARBY had 'a mere possible, contingent interest' or 'mere mental interest in the question or general subject' of such contracts. In order to find the defendant guilty under any count you must find that the interest of OLIN E. DARBY in the contracts alleged was such that he stood to 'gain or lose something' as a result of the contracts alleged."

Instruction *C*

"The interest in contracts which is prohibited by law to members of governing bodies of school districts is not '(1) A mere possible, contingent interest, in an interest in the question or general subject to which the matter . . . relates, but one that is visible, contingent and capable of precise proof . . . it must therefore depend upon facts capable of being precisely averred and proved . . . (2) It must be a pecuniary or proprietary interest, a relation by which . . . he will gain or lose something by the result . . . (3) It must be certain, and not merely possible . . .

" 'Thus the mere mental interest which one has in a public question merely because he is a citizen or member of the civic body to be affected by the question is not the interest which the law has in mind.'

"The interest prohibited by law cannot be 'remote, doubtful and speculative' but must be 'certain in fact'.

"The interest prohibited by law is a 'certain, definable, pecuniary, or proprietary interest or relation which will be directly affected' by the action taken on the contracts in question. It is a 'pecuniary or personal right or privilege directly affected by or immediately dependent upon' the contracts in question.

"In short, the interest prohibited by law must be 'a direct, pecuniary interest' and not an interest that is speculative."

by appellant, instructions *B* and *C* would have been their authority to acquit. But they applied the definition of "interest" as contained in *A* and convicted him. They believed he had more than "a mere, possible, contingent, or mental interest." ██ They determined that he stood to gain or lose something by the board's acceptance of the bid of Jack and Jill; that his interest was not remote, doubtful or speculative but was certain and direct. They found that his interest was personal and that it might interfere with the unbiased discharge of his duty to the public or might prevent his exercising absolute loyalty and undivided allegiance to the best interests of the Los Angeles school districts. It was therefore a prohibitive interest as contemplated by the statutes. (*Raymond* v. *Bartlett,* 77 Cal.App.2d 283, 286 [175 P.2d 288].) If the jury believed his interest in the ice cream contract was such as to tend in any degree to influence appellant's conduct in voting for the contract, their verdict was justified. (*Stockton Plumbing & Supply Co.* v. *Wheeler,* 68 Cal.App. 592, 602 [229 P.2d 1020].) In that case the petitioner's foreman was a member of the city council, but was absent at the time the contract was voted. The interest he had in the contract nullified it although it meant no direct profit to him. A similar situation obtained in *Hobbs, Wall & Co.* v. *Moran,* 109 Cal.App. 316 [293 P. 145]. Dressler was a member of the city council and was on salary and was not a stockholder in, but was manager for, Hobbs and Wall, and as councilman voted to pay their claims for the merchandise purchased by Crescent City. Mr. Justice Thompson observed, page 317, that Dressler *"was indirectly interested in the transaction* and that it was therefore illegal. . . . Our courts have been very scrupulous in the enforcement of the spirit of statutes similar to the one which is here involved." (P. 320.) In *People* v. *Deysher,* 2 Cal.2d 141, [40 P.2d 259], the court directed the jury that defendant had a personal interest in the contract if he possessed any rights or was obligated to perform any duty or *could have suffered any liability or losses or if any benefit or advantage could accrue to the defendant, whether present, future ascertained or potential.*

In support of his contention that he had no interest in the contract, appellant cites *Central Pac. R. Co.* v. *Superior Court,* 211 Cal. 706 [296 P. 883]; *Favorite* v. *Superior Court,* 181 Cal. 261 [184 P. 15, 8 A.L.R. 290]; *Ex parte Guerrero,* 69 Cal. 88 [10 P. 261]; *Cuyamaca Water Co.* v. *Superior*

*Court,* 193 Cal. 584 [226 P. 604, 33 A.L.R. 1316]; *Goods-speed* v. *Great Western Power Co.,* 19 Cal.App.2d 435, 438 [65 P.2d 1342]. Although in each of them the interest under investigation was not in existence at the time of the contract, yet the question considered in each controversy was whether a judge was disqualified because of an interest in the matter on trial. Those decisions establish that a judge is not disqualified where his interest is "remote, contingent and speculative"; that he is not disqualified unless his interest is "direct, proximate, substantial and certain" and of such immediate character that the judge will gain or lose by the direct, legal operation and effect of the judgment. As applied to judges, "interest" has a highly special and definite meaning. "It means an interest direct, proximate, inherent in the instant event." (*Goodspeed* v. *Great Western Power Co.,* 19 Cal.App.2d 435, 438, 444 [65 P.2d 1342].) In the cases involving the judges, none of them had a "direct," "pecuniary," or "proprietary" interest in the controversy. Where public "officials" as a class are involved, there should be no laxity in the enforcement of the statutes against their having an interest.

Appellant insists that his instructions *B* and *C* are inconsistent with the People's instruction *A.* Such asserted conflict is not to be discerned when all three are read as one. (*People* v. *Weatherford,* 87 Cal.App.2d 275, 278 [196 P.2d 832].) Instructions *B* and *C* emphasize that the disabling interest must be more than a remote, doubtful, speculative, possible, contingent or mental interest, and that in order to convict the accused, it must be found that he stood to gain or lose something. Under the evidence it was reasonable to find that the interest of appellant in the ice cream contract was such interest as might have interfered with appellant's unqualified devotion to his public duty. Whether the interest was direct or indirect, remote or contingent, the sum and substance of the three instructions read as a whole is that if the interest of the member is sufficient to cause him to be swayed in the slightest degree from his duty to the public, it is a violation of section 1097 as well as of 1011. It is more than possible that an interest may be contingent or remote and yet influence the member's judgment or vote. In view of the evidence adopted by the jury, the court was generous in giving instructions *B* and *C* but in all fairness they do not conflict with the principles declared in *A.* (See *Moody* v. *Shuffleton,* 203 Cal. 100, 105 [262 P. 1095]; *People*

v. *Deysher*, 2 Cal.2d 141, 146 [40 P.2d 259].) ▮▮▮ But conceding, *arguendo*, that the two instructions read at appellant's request conflict with that prepared by the district attorney, a reversal would not be proper for three reasons: (1) instruction *A* is a correct statement of the law; (2) instructions *B* and *C* gave appellant an advantage in permitting the jury to consider the facts in a light more favorable than if *A* only had been read; (3) if there be a conflict, it was caused by appellant's own act in submitting *B* and *C*. (*People* v. *Harris*, 169 Cal. 53, 69 [145 P. 520] ; *People* v. *Lanzit*, 70 Cal.App. 498, 513 [233 P. 816].)

Error is assigned with respect to the following instruction: ''The People do not have to prove actual fraud, dishonesty, or loss; nor is it a defense to a prosecution under section 1097 of the Government Code that there was no actual fraud or dishonesty or loss.'' Appellant contends that if such instruction be correct, the court prejudiced him by permitting evidence of fraud and dishonesty, i.e., the payments of excessive rentals. The answer to such contention is that there is no inhibition against allowing proof of an officer's dishonesty, for if it existed, such fact had to be a part of the evidence of his becoming interested. (See *Williamson* v. *Los Angeles County Flood Control Dist.*, 42 Cal.App.2d 622 [109 P.2d 992].) ▮▮▮ The jury were entitled to know all the facts which tended to prove the officer's interest even though such proof might show violations of other penal statutes. (See *People* v. *Pearson*, 111 Cal.App.2d 9, 18-19 [244 P.2d 35].) The core of the criticized instructions is that even though there is proof of dishonesty the jury's chief concern is to determine whether the accused was interested.

## No PREJUDICE IN RULINGS AT THE TRIAL

That there was no error in admitting evidence of appellant's attempt to obtain a higher income from his store by helping Jack and Jill obtain a share of the ice cream business has been demonstrated above. Neither was there error in permitting the district attorney to refresh the memory of a witness by reading to him on the stand his testimony before the grand jury. ▮▮▮ Refreshing the memory of a witness is not to impeach him. It is a common incident of trials to remind a witness of what he said on a former occasion, and this may be done by the party calling him. (*People* v. *Durrant*, 116 Cal. 179, 214 [48 P. 75] ; *People* v. *Horowitz*, 70 Cal.App.2d 675, 691 [161 P.2d 833] ; *People* v. *Allen*, 47 Cal.App.2d 735, 743 [118 P.2d 927].) · A detailed dis-

cussion of the witnesses whose memories were refreshed could add nothing of value to the above statement of the doctrine.

In *Stockton Plumbing & Supply* v. *Wheeler, supra,* page 603, it was conceded that the contract was perfectly fair in all respects to the city and that neither the councilman nor his employer gained any advantage thereby. But the contract was held illegal merely because the councilman was interested in seeing his employer make sales to the city. (*See* also *Hobbs, Wall & Co.* v. *Moran,* 109 Cal.App. 316, 320 [293 P. 145].) By virtue of the law as above announced there was no error in the court's instructing the jury that the existence of a combine and that savings to the school system resulted from the bid of Jack and Jill, is no defense to the charge contained in the indictment. The rejection of evidence offered for the purpose of showing that before Jack and Jill forced competitive bidding, one of the bidders charged the schools higher prices than it received from private retail dealers and that prices to the schools were lower each year thereafter; also, the rejection of proof offered for the purpose of showing that appellant had requested Olin to be on the lookout for a good tenant for his vacant store through other ice cream companies—both rulings were correct. Such evidence was immaterial to the issue as to whether appellant had an interest in seeing Jack and Jill obtain a share of the ice cream purchases for the school. ▪ That appellant may have had an interest as a public official does not disprove that he had a personal motive in having the board accept the bid of Jack and Jill. But even had such rulings been erroneous, no prejudice could have resulted for the reason that the court did admit sufficient of such evidence to enable appellant to present his point.

Appellant assigns as error the court's examination of Mr. Bresler, "a key witness for the prosecution." Mr. Bresler had testified that, after the introductions were finished, appellant "inferred that with the right kind of prices we may be able to acquire . . . a little ice cream business in the Board of Education." The court thereupon examined Bresler with respect to the latter's use of the word "inferred." The court's examination developed that the witness meant that appellant had in substance said they might get some of the board's ice cream business. ▪ Not only was there no error in the court's participation in quizzing Bresler but it was the court's duty to see that no testimony be left in a fog by reason of a misuse of words by a witness. (*People*

v. *Harris*, 87 Cal.App.2d 818, 826 [198 P.2d 60]; *People* v. *Cagigas*, 69 Cal.App.2d 301, 303 [158 P.2d 971]; *People* v. *Grebe*, 105 Cal.App.2d 27, 33 [232 P.2d 564].) But if the court's conduct had been prejudicial, the detriment was cured by appellant's cross-examination whereby he developed the witness' testimony to be as it had been given in response to the court's questions.

No prejudice was suffered by appellant on account of the court's admitting "full evidence before the jury of an Anaheim lease entered into after the school contract was awarded." Evidence was received that appellant on August 31, 1949, leased his Anaheim store to Bresler for the purpose of showing appellant's plan, design and motive. When the court learned that the Anaheim lease was subsequent to the date (August 23, 1949) of the Jack and Jill contract, the evidence as to the Anaheim lease was stricken. ▆ The jury are presumed to have followed the court's order to disregard all the evidence relative to the Anaheim property. (*People* v. *Sourisseau*, 62 Cal.App.2d 917, 929 [145 P.2d 916].)

Prior to the trial appellant filed an affidavit of prejudice against the trial judge averring that the judge was prejudiced against appellant for having failed to file his petition for a writ of prohibition in the Supreme Court by presenting it to the Chief Justice in person. He contends that the court erred in failing to comply with section 170 of the Code of Civil Procedure[5] and thereby deprived appellant of the right to have the court's disqualification tried by a disinterested judge. The fallacy of appellant's contention lies in the fact that the affidavit filed does not contain the facts whereby he would prove the judge's prejudice. Because it is insufficient in that respect, the court properly proceeded with the trial. The affidavit averred also that the judge had prejudged the law on the question of an officer's illegal interest in a contract and had refused to grant appellant a continuance during the period of the pendency of his petition in the Su-

---

[5]Section 170 provides that no judge shall act as such in any action when it is made to appear probable that, by reason of his own bias or prejudice, a fair and impartial trial cannot be had before him. When he has knowledge of the facts which disqualify him, and fails to declare them in open court, any party appearing in the action may file his verified written objection to a trial before such judge, setting forth the facts constituting the ground of the disqualification. After the judge has filed his verified answer thereto, the question of his own disqualification shall be heard and determined by some other judge agreed upon or selected by the chairman of the Judicial Council. The section contains a detailed statement of the procedure.

preme Court. ▇▇▇ While the trial judge may not determine a charge of his own disqualification, he may disregard an affidavit of prejudice when it avers conclusions and does not contain facts in proof of his prejudice. When the affidavit is thus insufficient, the judge can so determine, whereupon the procedure provided by section 170, *supra,* is not applicable. (*Ephraim* v. *Superior Court,* 42 Cal.App.2d 578 [109 P.2d 378]; *People* v. *Nolan,* 126 Cal.App. 623, 628 [14 P.2d 880]; *People* v. *Berman,* 117 Cal.App. 334, 339 [4 P.2d 226].) Not only was there an absence of facts indicating prejudice on the part of the trial judge, there is not the slightest showing of his hostility toward appellant. It was therefore insufficient. (*Goodspeed* v. *Great Western Power Co.,* 19 Cal.App.2d 435, 438, 450 [65 P.2d 1342].) Also, there is nothing for another judge to try where the trial judge is accused merely of having erroneous legal opinions. (*Ryan* v. *Welte,* 87 Cal.App.2d 888, 895 [198 P.2d 351].)

Another basis of the charge of prejudice against appellant was that the judge denied him a continuance. Such accusation raises no issue of fact. Such a denial involved the legal question addressed to the court's discretion. If the continuance had been denied, the trial judge had reasonable grounds. Prohibition had already been denied by both the superior court and the District Court of Appeal and no sufficient basis for a continuance was alleged. But, finally, the trial judge did grant a continuance of six days after the petition for a writ had been denied by this court.

Appellant charges that the district attorney prejudiced him by withholding documentary proof that appellant's store was operated under a written agreement between Blagg and Bresler. It is conceded that Mr. Blagg, while on the stand, believed the district attorney had possession of articles of partnership between Blagg and Bresler. Thereupon, the prosecution refreshed Blagg's memory and showed that it was the agreement of dissolution of such partnership that Blagg had in mind which document was delivered to appellant's counsel. Immediately thereafter, Blagg produced a copy of the articles of partnership of Bresler and Blagg. However, they are immaterial for the reason that *such articles were executed after Bresler as agent of Jack and Jill had consummated arrangements to lease appellant's vacant store*—from which it was fairly inferable that Bresler took the lease for Jack and Jill.

█ Appellant charges that he was prejudiced by the misconduct of the district attorney's withholding evidence that the business manager of the school system favored giving the entire ice cream contract to Jack and Jill. Such proof would have been immaterial. But after the prosecution proved by three witnesses what occurred before the purchasing committee on August 4 when it considered the bid of Jack and Jill, it was shown by the cross-examination of such witnesses that the business manager of the board desired to award the entire contract to Jack and Jill. Also, he testified that to do so would have been contrary to the usual manner of awarding contracts.

█ Appellant says he was prejudiced by the prosecutor's announcement to the news reporters at every court session what he expected to prove and his version of the testimony and that thus the jury were put in a position to prejudge the proof before they heard it from the witnesses. However, there is neither evidence of the statement made nor a bill of exceptions showing such acts were done by the district attorney. All the testimony at the trial had already been given before the grand jury. A record of it was available to the public. No part of the record is cited as proof that any juror heard any person talk about the evidence or read a news account of the testimony in violation of the instruction given at the commencement of the trial.

No prejudice to appellant could have resulted from the cross-examination of his character witnesses. After they had given him a good character they were asked whether they had ever heard of appellant's staying at a hotel in Yosemite as the guest of the principal stockholder of a corporation that had contracts with the board for transportation. █ After a character witness has testified it is proper to make such reasonable and searching inquiries as will test the accuracy and honesty of his testimony. It is proper to inquire whether the witness has heard of certain rumors, occurrences or charges as to specific acts of misconduct of the accused that might throw light upon the witness' testimony of the good reputation shown by his examination in chief. (*People* v. *Gin Shue*, 58 Cal.App.2d 625, 634 [137 P.2d 742] ; *People* v. *McKenna*, 11 Cal.2d 327, 335 [79 P.2d 1065] ; *People* v. *Stennett*, 51 Cal. App. 370, 382 [197 P. 372].) After such a witness has testified as to the defendant's good character his credibility is in issue.

█ One means available to the prosecution for testing his credibility is to inquire in good faith whether such witness

has heard of specified acts reflecting upon the integrity of the defendant. It is not incumbent upon the prosecution to prove the truth of the rumor or asserted misdeed. Indeed, an offer to prove it would be prejudicial misconduct. (*People* v. *Beltran,* 94 Cal.App.2d 197, 209 [210 P.2d 238].)

No prejudice to the accused was caused by the district attorney's allusion, in addressing the jury, to appellant's son whom he had brought home from the army to testify. That reference was an incident in the prosecutor's discussion of appellant's failure to give his own explanation of the events established against him.

Finally, there was no error in denying the motion for a new trial. Appellant made an affidavit that he could not with reasonable diligence have discovered before the trial evidence to refute the testimony of Mr. Bresler with reference to his conversation with Bresler at the office of the board to the effect that Mr. Darby indicated that with the right kind of prices he might be able to help Bresler acquire a little ice cream business; Bresler told Darby at the board's office the check was coming from Bresler, he would send it by Olin. Such affidavit averred also that Olin could testify in contradiction to Bresler; that at the trial he had every reason to believe that Olin would deny Bresler's testimony. Because Olin was ill and could not attend the trial, appellant conceives that he should have a new trial.

In the first place, the granting of the motion for a new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court. Whether the new witness was discovered with due diligence; whether his testimony would probably effect a different verdict— those were the factors that were weighed by the trial judge in deciding the motion. (*People* v. *Byrne,* 160 Cal. 217, 225 [116 P. 521]; *People* v. *Chavez,* 100 Cal.App.2d 214, 219 [223 P.2d 44].) There was no showing of diligence. Both Olin's and Bresler's testimony before the grand jury shows that Olin was present at the board's office; that Olin there introduced Bresler to Darby. During the trial the prosecution announced Olin's illness and his inability to attend the trial for 10 days. Appellant neither demanded a continuance nor leave to take Olin's deposition. Moreover, appellant, as a party to the conversation with Bresler could have testified to all that took place at the board's office. Also, no showing was made that Olin would probably recover from his illness, or if he should, that he would be able to testify. The fact that Olin would

testify that at the board's office nothing was said about appellant's leasing his store to Jack and Jill does not require a new trial. If both he and Bresler should in testifying contradict each other, it would create no more than a conflict, not a ground for a new trial. In addition thereto, Mr. Olin could not deny the statements Bresler had made over the telephone with respect to Bresler's taking a lease. Neither could Olin disprove appellant's receipt of the checks for rent of the store. He was witness to neither. After the court had extended every opportunity available for the presentation of his defense and after the accused had maintained a sphinx-like silence toward accusations and inferences that bore down upon him, it would have been gross error to allow a new trial in order for appellant to have another opportunity to gain a favorable verdict.

Appellant's motion to vacate the order correcting the record is denied. The appeals from the verdict and the several non-appealable orders, to wit, order overruling demurrer, order denying defendant's motion to set aside the indictment, order denying defendant's motion to strike the indictment, order denying defendant's motion for a continuance, order refusing to disqualify the trial judge upon defendant's filing an affidavit averring prejudice on the part of such judge, order denying defendant's motions to dismiss, before and after taking of the People's testimony, order denying motion to dismiss at the close of all the evidence, order denying motion to instruct the jury to return a verdict for defendant, order denying motion in arrest of judgment are dismissed.

The judgment and the order denying the motion for a new trial are affirmed.

Fox, J., concurred.

McComb, J., dissented.

A petition for a rehearing was denied December 5, 1952. McComb, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied December 23, 1952.