STATE EMPLOYEES — CONTRACTING WITH STATE AGENCIES — OKLAHOMA UNIVERSITY It is contrary to public policy under the Oklahoma Code of Ethics for State Officials and Employees, 74 O.S. 1401 [74-1401] — 74 O.S. 1414 [74-1414] (1969), for the University of Oklahoma to enter into a contract with the University of Oklahoma Research Institute whereby it assigns its share of a joint patent interest that is held as between it and its employee to a third party with the knowledge that the latter will subsequently contract with the University's employee or his alter ego. Title 74 O.S. 1405 [74-1405](a) (1969), prohibits state agencies from contracting with their employees or with a business in which an employee has a substantial financial interest unless the contract is made after public notice and competitive bidding, exclusive of the employment contract between the state agency and its employee. The prohibition affects contracts made indirectly between the agency and its employees as well as direct contracts between the two parties. The Attorney General has had under consideration the request for an opinion of J. Herbert Hollomon, former President of the University of Oklahoma, wherein he, in effect, stated: A question has arisen at the University of Oklahoma concerning the propriety of a proposed agreement between the University and the University of Oklahoma Research Institute. Basically, the facts are as follows. In 1967, Dr. James Sweeney was employed by the University of Oklahoma to be the Director of the Merrick Computer Center, the University computer facility. Prior to the time Dr. Sweeney arrived on the University campus, he had done a considerable amount of work on a generalized information processing system for use with computers. Dr. Sweeney continued to work on the development of this system for the University personnel. Eventually, he developed the system which is now called GIPSY. Subsequently Dr. Sweeney approached the University to determine the patent rights which he and the University had in the system. Generally if a professor developed a patentable idea at the University the patent belonged to the inventor, but because a substantial amount of University money had been used to develop GIPSY and because the system was developed to meet University needs, the GIPSY matter was not handled in the same manner. The University considered that it owned a substantial part of the patent rights in this particular invention. Since no University money was available to patent GIPSY the University of Oklahoma Research Institute was asked to employ patent counsel to prepare a patent application. This has been done and a patent application is presently pending. In the meantime Dr. Sweeney in investigating the possible commercial application of GIPSY has formed a corporation known as Information Systems, Incorporated to exploit the commercial uses of GIPSY. The University considered entering into an agreement with Information Systems, but did not believe it would be proper under 74 O.S. 1401 [74-1401] — 74 O.S. 1414 [74-1414] (1969), because its principal owners are University employees. At that time, the University proposed to sell all of its interests in the commercial application of GIPSY to the University of Oklahoma Research Institute for $125,000. The University would retain the right to use GIPSY in all University uses and all government contracts as well as certain other rights. The University of Oklahoma Research Institute is a nonprofit corporation organized under the laws of the State of Oklahoma and has entered into negotiations with Dr. Sweeney and his corporation and arrived at a tentative agreement. This agreement would provide that Information Systems would pay to the Research Institute $125,000 that would reimburse the Institute for their cost of acquisition of GIPSY from the University. In addition, the Research Institute would acquire 35 percent of the authorized common stock in Information Systems. In return Information Systems would receive an exclusive license from the University of Oklahoma Research Institute to all commercial use, sale and development of GIPSY. Dr. Sweeney would continue to be an employee of the University of Oklahoma and would continue to be the Director of the Research Institute. Because the University claims an interest in GIPSY and intends to sell a portion of its patent rights in the system to the University of Oklahoma Research Institute, and intends to continue to employ Dr. Sweeney, we are in need of your opinion to determine the propriety of the contemplated contract between the University of Oklahoma and the University of Oklahoma Research Institute. You then, in effect, ask: Is such a sale by the University of Oklahoma of its rights in GIPSY to the University of OkLahoma Research Institute permissible under the Code of Ethics in view of the Institute's subsequent agreement with Information Systems, Incorporated, Dr. Sweeney and other developers? The policy of the Oklahoma Code of Ethics for State Officials and Employees, cited supra, is found in Section 74 O.S. 1402 [74-1402], which provides in pertinent part: "It is hereby declared to be the policy of the State of Oklahoma that no officer or employee or member of the Executive, Judicial or Legislative branch of State government shall have any interest, financial or otherwise, or engage in any business or transaction of any nature which is in substantial conflict with the proper discharge of his public duties or with the public interest. To protect the public from improper use of authority, and to protect public officials from unwarranted assaults on their integrity . . . ." (Emphasis added) Pertinent terms are defined in the Code at Section 74 O.S. 1403 [74-1403], which provides in pertinent part: "(a) 'State agency' means any office, department, commission, board or other entity created by the Constitution or Statutes of this State "(b) 'State employee' means an elected or appointed officer or employee of the Executive, Judicial, or Legislative branch of government . . . . "(c) 'Substantial financial interest' means an interest that could result in directly or indirectly receiving a substantial pecuniary gain or sustaining a substantial pecuniary loss as a result of ownership or interest in a business entity, or the result of salary, gratuity, or other compensation or remuneration from any individual, partnership, organization or association." (Emphasis added) The prohibition to which you have referred in your letter is found at Section 74 O.S. 1405 [74-1405], which provides in pertinent part: "No state agency shall: (a) enter into any contract with a State employee of the agency, or with a business in which such person shall have a substantial financial interest, unless the contract is made after public notice and competitive bidding; provided, that this subsection shall not apply to a contract of employment with the State." Categorically, from the foregoing statutory provisions, it is apparent that the University and Dr. Sweeney fall within the purview of the definitions of a State agency and State employee, respectively. It is also evident that exclusive of those contracts made after public notice and competitive bidding and contracts of employment, State agencies and their employees are prohibited from entering into any contract with one another or a business in which such employee has a substantial financial interest. The stated policy provision of this Code would appear to have as its object to provide clear standards of conduct with which to guide the conscientious and deter the corrupt. Essentially, the policy provision attempts to avoid conflicts of interest which may arise during the tenure of public employment or office holding. This idea was borrowed from the common law rules regarding trusts and imposes upon the public servant the obligation of acting solely in the interest of the public, his beneficiary. Under the Code this fiduciary responsibility has been broadened to include not only an actual breach of this duty but also precludes those situations where the public might doubt the loyalty and integrity of the public official and employee. The immediate question posed is one of a possible conflict rather than an actual breach. See generally 47 Va. L. Rev. 1034. A "conflict of interest" has been defined in the following manner: "A conflict of interest . . . exists whenever a . . . public official, has placed himself in a position where, for some advantage gained or to be gained for himself, he finds it difficult if not impossible to devote himself with the complete energy, loyalty, and singleness of purpose to the general public interest. The advantage he seeks is something over and above the salary, the experience, the chance to serve the public, and the public esteem that he gains from public office." 1959 Minnesota Governor's Committee on Ethics and Government Report 17. We find no cases dealing with the specific point raised by the facts presented. However, we note that in determining whether or not a conflict of interest may exist in a given factual situation the courts generally decide each case on an ad hoc basis. See S. and L. Associates, Inc. v. Township of Washington, 61 N.J. Super. 312, 330, 168 A.2d 635, 645
(App.Div. 1960)(dictum); Tanozzo v. City of Rockford, 306 Ill. App.? 443, 451-52, 28 N.E.2d 748, 752 (1940)(dictum); People v. Darby, 114 Cal.App.2d 412, 250 P.2d 743 (appeal dismd) 345 U.S. 937 (1953); See also Williston, Contracts 1735 (Rev. Ed. 1938). There seems to be little question that to fall within the prohibition established by the Code of Ethics a contract does not have to be express, but may be implied in fact Poke Township v. Spencer,364 Mo. 97, 259 S.W.2d 804 (1953); Cornut v. Clay County,75 S.W.2d 299 (Tex.Civ.App. 1934) as well as by law. Hesse v. Wenke, 161 Neb. 311, 73 N.W.2d 223 (1955); Southern v. Bealer, 183 Tenn. 272,195 S.W.2d 857 (1946); Nelson v. Harrison County, 126 Ia. 436, 102 N.W. 197 (1905); See also 10 McQuillin, Municipal Corporations, 29.113. In view of Section 74 O.S. 1405 [74-1405](a), supra, it is necessary to consider how the University of Oklahoma gained its patent interest in GIPSY. It is assumed that such interest must have arisen by implication from the contract of employment. You indicate that the University believed it owned a substantial part of the patent rights in this particular invention because Dr. Sweeney had used University computers and University personnel to develop his system from the University. There appears to be no dispute respecting the mutual interests the University or Dr. Sweeney presently have. Inventions made partially at the employer's expense generally remain the property of the inventor unless he has, by the terms of his employment or otherwise, agreed to transfer to his employer its ownership or a portion thereof as distinguished from its use. Dinwiddie v. St. Louis and O'F. Coal Company, 64 F.2d 303, (4th Cir. 1933); C. V. Mosby Company v. Jones, 303 Ill. App.? 234, 24 N.E.2d 873 (1940); National Development Company v. Gray, Mass. 55 N.E.2d 783 (1944); and Barlow and S. Manufacturing Company v. Patch, 232 Wis. 220, 286, N.W. 577 (1939). In U.S. v. Dubilier Condenser Corporation, 289 U.S. 178, 77 L.Ed. 1114, 53 S.Ct. 554
(1933), the U.S. Supreme Court stated in the body of its opinion at page 1118 (L.Ed.): "The respective rights and obligations of employer and employee, touching an invention conceived by the latter, spring from the contract of employment." With the reasoning of Dubilier, supra, and the circumstances attending the development of GIPSY it is reasonable to conclude that the acquisition of the University's patent interest therein impliedly springs from the employment contract. Hence, the acquisition of such interest does not in and of itself violate the "no contract" prohibitions expressed by Section 74 O.S. 1405 [74-1405](a). However, subsequent contractual undertakings by the University relative to commercial development of GIPSY cannot be so characterized. Moreover, due to the broad language of Section 74 O.S. 1405 [74-1405](a), supra, any contract for commercial development (exclusive of those negotiated after public notice and competitive bidding), as between the University and its employee or his alter ego, would be in direct violation of its provisions. Likewise, any attempt to do indirectly that which the University was prohibited from doing directly would be a violation. In this regard see City of Canyon City v. Merris, Colo.,323 P.2d 614, 620 (1958). Therefore, it is the opinion of the Attorney General that your question must be answered as follows: It is contrary to public policy under the Oklahoma Code of Ethics for State Officials and Employees, cited supra, for the University of Oklahoma to enter into a contract with the University of Oklahoma Research Institute whereby it assigns its share of a joint patent interest that is held as between it and its employee to a third party with the knowledge that the latter will subsequently contract with the University's employee or his alter ego. Title 74 O.S. 1405 [74-1405](a) (1969), prohibits state agencies from contracting with their employees or with a business in which an employee has a substantial financial interest unless the contract is made after public notice and competitive bidding, exclusive of the employment contract between the state agency and its employee. The prohibition affects contracts made indirectly between the agency and its employees as well as direct contracts between the two parties. (Donald E. Herrold)